THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PAUL THOMAS PERTZ, Defendant-Appellant.

Second District   No. 2—91—0945

Opinion filed March 26, 1993.

870

Robert W. Brown, Jr., and Laura L. Kerton, both of Dunlap & Brown, Ltd., of Libertyville, and Law Offices of Patrick A. Tuite, Ltd., of Chicago (Patrick A. Tuite, of counsel), for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Paul Thomas Pertz, was charged by indictment with the offense of first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2)). The indictment charged defendant with causing the death of his wife, Jane Casey-Pertz, on October 12, 1990, by pushing her and striking her with a baseball bat with the intent to kill her and

with the knowledge that such acts created a strong probability of death to her. Following trial, the jury returned a verdict of guilty. At a subsequent sentencing hearing the trial court sentenced defendant to 45 years' incarceration. This appeal ensued.

On appeal, defendant raises 14 issues: (1) that the trial court erred in denying defendant's motion to suppress his statement and quash his arrest; (2) that the trial court erred in denying defendant's motion to suppress evidence seized during several alleged consent searches; (3) that the trial court erred in denying defendant's motion to quash the search warrant; (4) that the trial court erred in limiting the cross-examination of the State's forensic pathologist and the direct examination of defendant's expert neurologist; (5) that the trial court erred in restricting the testimony of defendant's expert witness psychiatrist; (6) that the trial court erred in handling the State's motion *in limine* regarding the testimony of defendant's expert witness psychiatrist; (7) that comments by the prosecutor during rebuttal argument were highly prejudicial, depriving defendant of a fair trial; (8) that the trial court abused its discretion in allowing certain photographs to be published to the jury and to be considered by the jury during its deliberations; (9) that the trial court erred in allowing the State to question the defendant's expert psychiatrist about the amount of his fee; (10) that the trial court erred in giving the State's instruction No. 8, defining "knowledge," and instruction No. 11, pertaining to the completion of the verdict forms; (11) that the State failed to prove defendant guilty beyond a reasonable doubt of first degree murder; (12) that defendant's sentence of 45 years was excessive; (13) that defendant was denied a fair sentencing hearing; and (14) that defendant was denied due process by the State's systematic exclusion of males from the jury.

Defendant filed a series of pretrial motions, including motions to challenge the voluntariness of his confession and the legality of his arrest, motions challenging the legality of searches made pursuant to consent, motions to quash a search warrant, and motions to suppress. A hearing was held on April 1, 1991, on defendant's motion to suppress statements, motion to suppress consent searches, and a motion to suppress evidence. At that hearing Ronald Fry, a lieutenant with the Libertyville police department, testified that on October 13, 1990, he was advised to look into a missing person's report filed by defendant. He telephoned defendant, who asked him to come to his residence. Fry stated that he had known defendant in the past when defendant "rode with" an officer who had been in the department. When Fry arrived at defendant's residence, he observed that defend-

ant appeared nervous but otherwise neat and normal. He was not under the influence of alcohol or drugs. Fry took information and filled out a missing person's form, which defendant signed.

On October 14 at 11 a.m., defendant asked Fry to return to defendant's residence to straighten out a misunderstanding as to the shoes defendant's wife had been wearing when she disappeared. Fry went with Detective James Schlesser in an unmarked vehicle that did not separate the backseat or lock to prevent the backseat passenger from exiting. Defendant was dressed casually, demonstrated a normal demeanor, and was not under the influence of alcohol or drugs. Defendant invited the officers into the residence, where two other people (the Stebers) were already present. Defendant asked the officers to go upstairs to check clothing and shoes in the master bedroom closet. Fry told defendant that he would first like defendant to sign a form consenting to the search. Defendant asked why he had to sign when he had asked the officers to come to his home. After Fry explained the nature of the form, the reason for the consent to search, and told defendant that he did not have to sign it, defendant signed the form. The officers proceeded with defendant to the upstairs bedroom. From there they went into each room in the house and into the garage. Defendant never indicated he did not want the officers to enter the other rooms, and he was very cooperative.

At approximately 3:15 p.m. that same day, Fry asked defendant if he would mind coming to the police station. Because there was so much activity at the house, the officer wanted to straighten out some contradictions in defendant's report in a place affording a little more privacy. Fry recalled that defendant appeared nervous but did not seem tired and was not under the influence of alcohol or drugs. Defendant rode to the police station in the front seat of the squad car on the passenger's side. He was not handcuffed or touched, nor was he under arrest. Fry said that had defendant been arrested, he would have been handcuffed, transported in the backseat of the squad car, and taken to a garage area within the station. Fry parked the squad car outside the station. At no time was defendant patted down for weapons.

To enter the police station, Fry had to use a key or be buzzed into the department. Fry took defendant to a conference room; he did not take him to the booking room. Fry stated that there was a door next to the conference room that exited to the outside and that it was not locked. Fry explained to defendant that Fry wanted to go over the case report with him from start to finish. He then left defendant to

get some papers. According to Fry, he never locked the door to the room.

Fry returned to the conference room with Detective Charles Bell. Defendant appeared fine and normal and was not emotional or crying. The officer sat down and talked to defendant for half an hour to 45 minutes. Fry recounted that defendant was occasionally a little emotional but otherwise seemed fine and very cooperative. The officers went through the entire report with defendant and noted several discrepancies. The officers then excused themselves to get some coffee. Defendant was left alone in the room for about 10 minutes. The officers did not lock the room, and the defendant was not in handcuffs.

Fry said that the officers returned and closed but did not lock the door. They informed defendant that the car defendant had reported missing had been located and that a female body had been found in the trunk. They read defendant his *Miranda* rights at that time. When Fry asked whether defendant understood the rights, defendant responded affirmatively. Defendant signed the *Miranda* form when requested. Fry stated that, either at that time or after his rights were read, defendant asked the officers whether he was under arrest, and the officers replied negatively. According to Fry, defendant did not invoke his right to remain silent, refuse to answer questions, or request an attorney. The officers did not promise him anything or coerce him. At one point, defendant asked whether he should get an attorney, and Fry responded that it was defendant's decision. Fry recounted that defendant said nothing more about an attorney and continued answering questions.

The officers asked defendant to look at a picture of the body found in the trunk for purposes of identification. Defendant identified the body as his wife; he became distraught and began sobbing.

Fry said that he remained in the conference room only 10 minutes and then left defendant with Detective Bell. Fry returned over one hour later after defendant had confessed. Defendant agreed to show the officers where he had disposed of some of the evidence. The officers used the same squad car with no barricade that Fry had used earlier to transport defendant. Defendant was not handcuffed and the officers did not hold him as he walked to the car. Also, the car door was not locked. Fry recalled that defendant was cooperative and directed the officers to various locations where he had disposed of the evidence. After they returned to the station, defendant was asked for consent to search his truck. Defendant said that that was no problem and signed the consent form.

On cross-examination, Fry stated that the missing car had been found at approximately 5:30 a.m. and that he had learned of this when he arrived at the station at 6:30 a.m. Fry understood that a search warrant for the car was being prepared and that it was issued at 9 a.m. Fry was present when the car was searched at 9:20 a.m. He was not certain of the identity of the body.

With reference to the form giving consent to search defendant's house, Fry stated that he had filled out the entire form before asking defendant to sign it and that he told defendant that he did not have to sign it. After finding spots on the garage floor, Fry called for an evidence technician. Five to six officers eventually arrived at the house. Fry stated that he offered to drive defendant to the station in the squad car but would have allowed defendant to take his own car if he had asked. At the police station it was necessary to use a buzzer system to enter but not to exit, and defendant could have left any time he had wanted.

Fry testified that when the *Miranda* warnings were read, he asked whether defendant understood them and asked him to sign on the signature line. He told defendant that he did not have to sign the *Miranda* form. Fry denied that he told defendant that defendant did not need a lawyer or that defendant indicated to the officers that he no longer wanted to talk. When defendant consented to the search of his truck, Fry filled out the form before the defendant signed it.

Fry stated that defendant was shown his wife's picture for purposes of identification and repeatedly denied that it was an interrogation technique.

James Schlesser testified that he was a detective on the Libertyville police department in October 1990. At about 10:30 a.m. on October 13, he asked defendant to come to the department to talk about his missing wife. Schlesser related that defendant either drove himself or came with a friend and was taken to an interview room when he arrived. His friend remained in the lobby. Defendant appeared nervous during the interview and cried occasionally although Schlesser characterized it as "an act." Schlesser acknowledged that defendant did not appear to have been under the influence of drugs or alcohol during the interview. After the interview Schlesser thanked defendant for coming to the station, and defendant left.

The next day at 7:55 a.m. defendant called Schlesser at the station to ask whether his wife or her car had been found, to say that the shoes his wife had been wearing were in the house, and to describe an altercation his wife had had with others.

Later that day, after Fry had received a call from defendant, Schlesser accompanied Fry to defendant's house. According to Schlesser, defendant asked the officers to look around the house, and Fry gave defendant a consent form to sign. Defendant questioned the need to sign the form since he had invited the officers to look around. Schlesser recalled that the officers did not threaten or promise defendant anything to sign the form. Defendant was told that he did not have to let the officers in the house, and he did not have to consent to the search. Defendant did not indicate that he wanted to limit the search to the bedroom closet.

Charles Bell, a police detective for the Village of Libertyville, was called into work on October 14, 1990, to investigate the murder of Jane Casey-Pertz. He met with defendant at 3:30 p.m. in an interview room at the police department. When he first saw defendant, defendant was sitting with Lt. Fry, unemotional, and not under the influence of alcohol or drugs. Bell closed the door to the interview room but did not lock it. The two officers spoke with defendant for approximately an hour and a half about his wife's disappearance. During a break, defendant was left alone in the room with the door unlocked. He was not under arrest, and if he had chosen to leave, he would have been allowed to do so.

Schlesser recalled that at 5:15 p.m. the officers reentered the room and told defendant that they had found the missing car with a female body in the trunk. Defendant "kind of whimpered a little bit" upon being given that news. After defendant was shown a photograph of the body, Fry read the *Miranda* rights. According to Bell, defendant appeared to listen and understand the form, and he signed it after looking at it. No promises or threats were made by the officers. Defendant never invoked his right to silence or asked for an attorney. When defendant asked whether he needed an attorney, the officers responded that that was his decision. Bell recounted that Fry left about 15 minutes later. Defendant then told Bell what had happened and executed a statement.

Schlesser stated that defendant was not arrested until much later that evening. Before his arrest, he accompanied Bell and Fry to find evidence. Defendant was not handcuffed during that time, and he was cooperative. Bell recalled that defendant was readvised of his *Miranda* rights before accompanying the officers and before giving his written statement upon his return.

On cross-examination, Detective Bell stated that he did not know defendant well before the incident. He could not recall whether he escorted defendant to the bathroom during the interview but said that

defendant could have gotten up and walked out any time until his arrest. Bell explained that Fry left the room because Fry had known defendant for a long time and felt that his presence was hindering the interview. Bell denied that defendant had any conversation in which defendant said he would acknowledge his rights but would not waive them. Bell also denied that defendant requested an attorney or that the officers persuaded him to forego an attorney; that either officer said that defendant should tell them what happened so they could all go home; that if defendant made a statement, they would get him an I-bond; or that if he made a statement, they would tell the judge the incident was an accident. Bell stated that the photograph of the body was shown to defendant for purposes of identification. After defendant asked whether he should get an attorney, the officers repeated the *Miranda* warnings.

Janice Steber testified that she had worked with the victim and knew the victim and defendant socially. On October 14, 1990, she called defendant to find out whether defendant's wife had been found; she went over to the house at 8 a.m. Steber said that defendant appeared upset but did not seem to be under the influence of alcohol or drugs. She was present when defendant called the police and recalled that they arrived at 11 a.m.

According to Steber, defendant let the officers in and stated that he wanted them to look in the closet. The officers handed defendant a paper, explaining that it was not a search warrant but would give them permission to search the house and remove any evidence. Steber stated that defendant said that he did not think he should sign it, and the officers responded that they could not search without his permission. Finally, Steber recounted that she said "sign the gawd damned paper, they are trying to find your wife." Defendant appeared to read the paper and then signed it.

The two officers, Steber, and defendant went upstairs. Defendant showed the officers an item of clothing in his bedroom closet. They then went through the remainder of the house with defendant leading and explaining the functions of the rooms. In the garage defendant provided a flashlight and opened the garage door at the officers' request.

Steber recounted that before defendant left with Lt. Fry he told Steber that he did not want to leave with all the policemen in the house. Defendant asked Steber and her husband to stay, and they assured him that they would. Defendant explained to Steber that he was told that the officers wanted to go over his statements and that there was too much confusion in the house.

On cross-examination, Steber said that she understood from the officers' explanations of the consent form that they would search more than a closet. After they looked into the closet, either she or defendant asked them where they wanted to start. Occasionally, Fry asked defendant to open certain areas and defendant complied. Steber compared the search to a real estate walk-through.

Defendant testified that on October 14 Jan Steber and her husband arrived at defendant's house. Steber had offered to help with the description of the clothing worn by defendant's wife. Defendant called Lt. Fry sometime between 9 and 10 a.m. and asked him to come over to the house, saying that Steber could assist in providing a description of the clothing. Fry arrived between 1 and 1:30 p.m. accompanied by Detective Schlesser. Defendant recalled that he opened the door and invited the two officers into the house. Defendant talked to the officers about looking into the closet. Fry gave defendant a sheet of paper and said that he had to sign it or else they could not look into the closet. According to defendant, the paper had only been filled in with the date. Fry filled in the other portions after defendant signed and returned the paper although defendant could not see what he wrote.

Defendant related that the officers, Steber, and he went up to the bedroom closet where Steber pointed out items similar to those she thought the victim had been wearing. After she exited the closet, the officers "started wandering around" the bedroom and into the bathroom. Defendant said that he did not dissuade them. He explained that Fry, Steber, and he were talking while Detective Schlesser detached himself from the group.

According to defendant, Fry led them out of the bedroom, walked into a second bedroom, and asked what it was. Defendant replied that it was a spare room. When Fry asked to look into a closet, defendant said, "Sure," and opened the door. Defendant said that he also opened a black bag containing a comforter when Fry asked to see it. Defendant stated that this pattern of conduct continued in the upstairs area. When they went downstairs, Fry asked to look into the entry closet, and defendant opened it. Defendant said that he did not feel he could refuse because "[t]hese guys are uniformed and that and they seemed very official and just seemed like he wanted to go everywhere."

Defendant testified that he went to the Libertyville police station at about 3:30 p.m. that same day. After he had been there for some period of time, but before he was given his *Miranda* rights, Fry placed a sheet of paper in front of him and said that he needed his

signature on it so the police could search defendant's truck. Defendant was told that "this is just like the form before except it's for your truck." Defendant could not recall anything on the sheet. Defendant said that he did not feel that he could refuse the request. Defendant stated that he had seen officers looking into the truck before he was taken to the police station and that he gave police a key to the back of the truck when he signed the form.

Defendant recalled that on October 14 Fry asked him to go to the police station so they could go over defendant's previous statement. Fry explained that there was "just too much commotion around here." Defendant said that he intended to drive himself and told Fry that he would meet him there in a little while. Fry responded that he would take him. When defendant insisted that he wanted to wait until "all these people" were gone, Fry repeated that defendant should come with him and do it now. Defendant said, "Okay," grabbed his jacket, and got into the squad car. Defendant said that he rode in the front passenger seat and that, on arrival at the station, he and Fry walked in through the west entrance of the building.

Defendant described the security door to the building, saying that he "buzzed" the door while Fry opened it. Defendant said that he was very familiar with the building through his work with the telephone company and that he used to hang around with some of the older officers, often riding along with them on their shifts.

Defendant stated that he was alone in an interview room for approximately five minutes and then was joined by Fry and Detective Bell. His conversation with the officers lasted approximately an hour and concerned his whereabouts on the night in question. The tone of the conversation was friendly.

Following this conversation, Fry left and then returned with a consent form. He left again and returned with another form. Defendant asked how much longer the interview was going to take, saying that he had to go home to let the dogs out. According to defendant, Bell responded that they would stay all night if they had to to "get to the bottom of this." Defendant said that the officers got "kind of testy," and defendant did not feel that he was free to leave. As Bell was leaving the room, defendant asked whether he could use the bathroom, and Bell accompanied him and waited while he used it. Defendant said that he knew where the bathroom was located. Bell then escorted defendant back to the interview room and told him to wait there; the officers would be right back.

When the officers returned, Fry handed defendant "the *Miranda*." Defendant could not recall whether any of the form was

filled out. Defendant recalled that Fry said, "I need you to sign this, Tom." According to defendant, he began reading the warnings and recognized them from television programs. He said that he did not want to sign the form, that he thought the officers were placing him under arrest, that he wanted an attorney, and that he did not want to waive any rights. The officers told him that he was not under arrest and that his signature would acknowledge that he had received his rights. According to defendant, the officers said they would have to turn "it" over to "them" if he refused to sign. Bell referred to "the big guys" when defendant asked who was meant by "them." An argument regarding waiving his rights continued for approximately 15 minutes and then defendant signed the form, stating that he was acknowledging but not waiving his rights.

It was defendant's testimony that he repeated his request for a lawyer several times that evening. According to defendant, he was told that he did not need one and that he could call one later. Defendant recalled that he was not shown the photograph of his wife until after Fry left. Bell told defendant that the police knew that "something's not right." The officer said that they found the car and then told defendant that they wanted him to identify the photograph. Defendant broke down in tears and started crying. Defendant said that he had been awake for 60 hours, that he had been distraught and upset, and that he had been taking prescription and nonprescription medication.

Defendant testified that he again stated that he did not want to waive his rights when he was being taken out to find evidence. After the officers and defendant returned to the police station, defendant was taken back to the same interview room and told to have a seat for a minute. According to defendant, the officers returned no more than five minutes later and took him to the booking room. At that time, defendant prepared his written statement. Bell did not readvise him of his rights. It was defendant's testimony that he was told that the officers just wanted to help him, that they knew it was an accident, that they would tell the judge that it was an accident, and that the judge would probably set a bond and allow defendant to go home.

On cross-examination, defendant said that he went to the police station at 4 a.m. Saturday, October 13. Later that afternoon, he returned to the station to talk to Detective Schlesser. The conversation occurred in the same interview room used the next day. When he left the room, Schlesser ushered him out to the lobby. Defendant knew that he did not have to be buzzed out to go from the police department into the lobby of the building.

Defendant admitted that when he went to the station with Fry that he was not handcuffed or pulled by the arm. He said that he felt he was under arrest when he said he had to feed the dogs and was told the police would not be done until the matter was cleared up.

Following argument, the trial judge ruled that the first two consents, *i.e.*, to search defendant's house and to search his truck, were given freely and voluntarily. The court found that defendant was not in custody when he was taken to the police station, that the police testimony was more credible as to the circumstances regarding the giving of defendant's rights, that the police engaged in no improper conduct, and that defendant was not placed under arrest until after he gave his statement.

The trial by jury of this matter began on June 3, 1991. Karen Stift, a dispatcher for the Libertyville police department, testified that defendant came into the station on October 13, 1990, at 4 a.m. to report that his wife was missing and had not come home after work. She described the efforts that defendant claimed to have made to find his wife by checking her workplace and the restaurant at which they had planned to eat.

Donald Johnson, a Libertyville police officer, testified that his routine patrol took him to a parking lot in the Forum Square area at 5:30 a.m. on October 14, 1990. He found a vehicle that had been reported missing and arranged to have it towed. While waiting for the tow truck, he observed what appeared to be blood on the back of the car.

Paul Jennings, a Libertyville police officer, witnessed the search of the car on October 14, 1990, at 9:20 a.m. When the trunk was opened, he saw a female body lying crossways on its right side with the head toward the passenger's side. He observed the injuries to the head and face. At 12:10 that same day Jennings was assigned to "take charge" of the car and body for purposes of chain of evidence.

Lt. Fry testified that on October 13, 1990, at 7:15 a.m. he was called by a Waukegan police officer who had been asked to look into a missing person case involving the name of Pertz. Later that morning Fry went to defendant's home and saw defendant, Adam Clark, and Bill McCaffrey. According to the officer, he questioned defendant about his wife's disappearance. Defendant said that there were no problems and that he could not give a reason for the disappearance. Defendant told Fry that he had talked to his wife at work at 6:30 p.m., that they had made arrangements to meet at 7:30 p.m. at the yacht club, that he thought she had been home because he found her portable phone there, and that he found a woman who had talked to

his wife by car phone at 7:30 p.m. Fry related that the defendant showed the officer a track in the backyard, which Fry believed to have been made by a tire or a garbage can.

Defendant also reported his own movements to the officer, saying that he went to the yacht club at 8:30 p.m. and called his wife at 9:30 p.m. to see where she was, leaving a message on the answering machine. Fry further stated that defendant told the officer that he left the club at 10:30 p.m., spent time on his boat because he was not feeling well, and then went home, arriving at 12:30 a.m. or 1 a.m. When he arrived, he woke up Adam Clark, a friend who lived at the Pertz house, and the two of them checked the victim's route home and her mother's house. At 4 a.m. they went to the police station.

Fry testified that on October 14 he received a message that defendant had called, and the officer returned the call. Defendant asked Fry to come to his residence to clear up a misunderstanding about the shoes that his wife had been wearing. Fry went to the house at 12:30 p.m. accompanied by Detective Schlesser. Fry described the search of the house and the discovery of spots appearing to be blood on the garage floor in the area where the rear of the second car would have been parked.

At 3:15 p.m. on the same day Fry stated that he requested defendant to come with him to the station, where they were joined by Detective Bell. Defendant recounted his supposed actions on the night of the victim's disappearance. Fry recalled that defendant stated that he did not have any domestic or marital problems and had no financial problems. Defendant told Fry that there had been one argument with his wife regarding a boat race and defendant's drinking. Defendant also stated that there had been no sexual activity between his wife and him due to his high blood pressure medication. Following a break, the officers had defendant identify a photograph of his wife and gave him *Miranda* warnings. According to Fry the officers told defendant that there were inconsistencies in his statements and that they did not think he was telling the truth. At that point, Fry left the conference room.

At 6 p.m. defendant, Bell, and Fry went with defendant pursuant to defendant's agreement to help them recover evidence. The officers first recovered a baseball bat off the banks of Liberty Lake and a bag of rags from a dumpster in an unincorporated manufacturing complex. Defendant directed the officers to two additional areas to find shoes and a wallet, but they were unsuccessful.

Janice Steber testified that she had known defendant for about 25 years and considered him a friend. She knew the victim for five years

and had worked with her. Steber last saw the victim at 2:30 p.m. on Friday, October 12, 1990; she was alive and well. According to Steber, defendant called her at 5:30 a.m. on October 13, told her that his wife had not come home the evening before, and asked whether Steber knew where she was. Steber and her husband drove the victim's route home to see whether she had had an accident. When she saw defendant that day, he appeared concerned, upset, and was crying but otherwise normal.

Steber testified that the next day, October 14, she called defendant at 7 a.m. Defendant asked her to come over to see whether a pair of shoes the victim had been wearing was in the house. Steber and her husband went to defendant's house. Defendant appeared concerned but was more in control of his emotions.

Robert Bjork worked as a bartender at the yacht club in Waukegan on October 12, 1990. He saw the defendant come in at 8:30 p.m. Bjork recalled that defendant, who always took the same bar stool unless it was occupied, took a stool in a different section of the bar. Bjork approached him and asked whether he was ready for a drink. Bjork did not see defendant leave.

Jasper Amedio testified that on October 12 he was at the yacht club between 8:30 and 9 p.m. with his wife, Kim Richards and his wife, Ed Cohen and his wife, and Jim Spiegel. Amedio saw defendant at the bar and engaged in a discussion with him and Randy Clair regarding yacht club affairs. According to Amedio, defendant was acting normally that night.

David Poulton, an investigator with the Libertyville police department, testified to a notification he received from William McCaffrey. McCaffrey had taken a call while at the Pertz home from Sandy Durrough, whose father, William, had found credit cards and identification belonging to the victim in a dumpster near the lakefront in Waukegan. Poulton stated that he investigated the site and found other items of identification. The dumpster was a block and a half to two blocks from the yacht club.

William McCaffrey knew defendant and his wife for three years through the yacht club. McCaffrey had also been a Waukegan police officer. On October 13 he received a call from defendant between 4:30 and 5 a.m. According to McCaffrey, defendant appeared upset and told him that "Jane did not come home last night." When McCaffrey arrived at defendant's house, he observed that defendant seemed to be a concerned husband and tried to calm him down. During his conversation with defendant at the house, defendant gave a detailed report of his activities on the evening of October 12. At McCaffrey's

suggestion the two men checked the house. McCaffrey stated that he observed that the floors of the kitchen, the mud room, and the hallway were spotlessly clean. He noticed that the house was dusty with cobwebs above waist high. Defendant said that a cleaning lady had just been there. Defendant then "blurted out" that "someone's been in here," stating that a door was unlocked. According to McCaffrey, defendant opened the door and said, "Oh, my God." When McCaffrey asked him what was wrong, defendant answered that "somebody dragged something through the grass." McCaffrey saw two drag marks. He restrained defendant from going outside and said that they should wait for the police.

McCaffrey stated that defendant and he continued into the garage where McCaffrey saw that defendant's car was parked "right in the middle" of the garage and that there was a garbage container by the door with wheels that appeared to be the width of the drag marks in the yard. Defendant told McCaffrey that everything in the garage appeared fine. As they walked back into the kitchen, defendant said, "Oh my God, Jane's been home." McCaffrey stated that defendant showed him a red bag sitting on a table and said that she never went anywhere without the red bag. The red bag held her car phone.

McCaffrey recalled that defendant said that he did not want to wait 24 to 48 hours to make a police report and asked McCaffrey what he could do, as a former police officer, to move things along. McCaffrey said he spoke with Lt. Sroka of the Waukegan police department. A short time later, Lt. Fry arrived at defendant's house. As Fry began questioning defendant, defendant asked McCaffrey to remind him of a detail. McCaffrey responded that defendant should tell the story as well as he could. McCaffrey said that Fry was told about the open door and drag marks in the yard. As they looked at the area, defendant observed that the bottom of the gate appeared to have been kicked in. McCaffrey observed that the damage appeared recent. As they reentered the house, McCaffrey noticed that even after he cleaned his shoes, they left mud and grass clippings on the floor.

McCaffrey stated that after Fry left he accompanied defendant to the home of the victim's mother and then went with defendant for breakfast. When the two men returned to defendant's house, McCaffrey discussed previous cases involving confessions in a manner so as to give defendant an opportunity to speak if there was anything he wanted to say. During the entire morning, defendant seemed emotionally upset, but, according to McCaffrey, did not appear to have anything physically wrong with him and did not complain of feeling ill.

After receiving a telephone call, McCaffrey said that he drove defendant to the police station and waited an hour and a half. Defendant's parents came to the station during the wait, and McCaffrey left defendant with his parents. McCaffrey saw defendant later that evening. Defendant was emotional but carried on a normal conversation.

Dr. Larry Blum, a forensic pathologist, testified to his qualifications and the nature of his specialty. He stated that he performed an an autopsy on the body of Jane Casey-Pertz on October 15, 1990. In examining the body externally, he noted an inch-and-a-half laceration over the right eye, gaping to three-quarters of an inch. The soft tissue around both eyes was bruised and swollen as was the left temple region. There was a one-millimeter defect at the back of the head.

Internally, Dr. Blum found skull fractures involving both sides of the head, while the soft tissue and muscle beneath the scalp showed bleeding or hemorrhage or large bruises. Blum stated that there was bleeding overlying the brain on both sides of the head as well as bleeding on the surface of the brain under the membrane. The brain tissue was bruised, more on the right side than on the left. There was hemorrhage within the ventricular cavities. Dr. Blum said that he found blood in the trachea as well as the stomach; this indicated a period of survival between the injury and the death. Dr. Blum opined that the two injuries to the head were consistent with a baseball bat. He judged that the victim died of respiratory failure due to multiple blunt trauma to the head resulting from a beating. According to the doctor, death would have ensued within 5 to 15 minutes of receiving the injury. The one-millimeter defect on the back of the skull would not have caused death.

Dr. Blum stated that, in his opinion, the victim was struck a minimum of two times with the bat. One of the blows was delivered in a downward direction as it struck the right forehead; the other was straight to the side of the head. Dr. Blum said that the wounds could not have been inflicted while the victim was facedown. She could have been either standing or lying face up when the injury to the left temple was inflicted and was most likely, according to the doctor, lying face up when the injury to the right top of the head was inflicted although she could have been standing.

Dr. Blum stated that the "defect" on the back of the victim's head was "just a little tiny opening there. Not deep at all *** it might be just a little superficial cut." He stated that it would not bleed very much because it was so superficial. According to the doctor, there was no bruising, no scraping, and no abrasion around it.

Randall Clair testified that he is a member of the Waukegan Yacht Club and knows defendant. He was at the club on October 12, 1990, ate dinner, and went to the bar area at about 9:15 p.m. where he saw defendant at the bar. Defendant appeared perfectly normal. Clair stated that at one point he asked defendant whether defendant and his wife would like to sit with him at an upcoming event. Defendant told Clair that he would check with his wife and let Clair know. Clair left the yacht club with defendant at 10:30 p.m. and saw defendant get on his boat.

Calista Woodbridge worked with the victim on October 12, 1990. She noticed that the victim was not at her desk at 7:30 p.m. and received a call from her at 7:20 or 7:25 p.m. Woodbridge hung up at 7:25 or 7:30 p.m.

Adam Clark lived with defendant and his wife on October 12, 1990. On that date he returned home at 9:30 or 9:35 p.m. According to Clark, he noticed nothing unusual about the house. He went to bed at 11:30 p.m. and was awakened at 1 a.m. by defendant, who asked whether he knew where Jane was. The two men went out to look for her. Clark stated that he was not paying attention to defendant's condition but noted that he was worried about his wife and that he seemed to be able to drive. The men looked at the victim's mother's house, the victim's office, and a hospital parking lot, returning home by the route the victim would have used. They checked near the yacht club and then went to the Libertyville police station between 4 and 4:30 a.m. to file a missing person report. Afterwards, the two men went home.

Detective Charles Bell testified that he was contacted at 5:30 a.m. on October 14, 1990, and told that the car belonging to Jane Casey-Pertz had been found. Bell said that he directed the car to be towed to the station. When he inspected the car, he saw what appeared to be blood droplets on the rear bumper and taillights. Bell obtained a search warrant and then returned to search the vehicle, finding the body of Jane Casey-Pertz in the trunk.

At approximately 3:30 p.m. Bell met with defendant and Lt. Fry at the police station. The first part of the conversation lasted an hour and a half and concerned defendant's whereabouts on October 12. Bell stated that the two officers then took a break for 10 to 15 minutes. When they returned, Fry read defendant his *Miranda* rights and then advised him that his wife's car had been found with a body in it. Fry showed defendant a photograph for identification. Defendant identified the body as his wife. According to Bell, Fry left the room and

soon after that defendant stated that he did not mean to kill his wife, that it was an accident.

Bell related that in his statement defendant explained that his wife and he had had an argument when she arrived home at about 7:15 p.m. and that he had lost control, grabbed her by her coat, and pushed her. She fell backwards and hit her head on the kitchen floor. Bell said that defendant told the officers that he saw a large amount of blood and urine on the kitchen floor. Defendant told the officers that he was scared and knew that she was dead. After walking around the kitchen because he did not know what to do, defendant decided to make it look as if his wife had been attacked. According to Bell, defendant said that he got an aluminum baseball bat from the garage and hit his wife with it once or twice in the head. He then put her body in the trunk of the car along with the bat and left to drive around. Defendant told Bell that he drove aimlessly and then decided to throw the bat into Liberty Lake, two miles away. He then parked the car and walked home.

At home, defendant used a couple of rags and a sponge to clean up the kitchen floor. He changed his clothes and then gathered his clothes, the rags and sponge, the victim's purse and shoes, and his own shoes. He left the house and disposed of these items in various places before going to the yacht club.

Bell stated that after defendant made his statement, he showed Bell and Fry where he had disposed of the evidence. The baseball bat, the rags, defendant's left shoe and defendant's shirt and jeans were found. Defendant directed the officers to the places where he had left the victim's shoes and purse, but they were not found.

After the officers and defendant returned to the station, Bell recounted that he asked defendant to give a written statement, and defendant agreed. The written statement was very similar to his oral statement.

Detective James Schlesser testified that he asked defendant to come to the police station on October 13 to discuss his wife's disappearance. Defendant's statement concerned his original description of his movements on October 12. According to Schlesser, defendant seemed very nervous during the interview.

On October 14 Schlesser received a telephone call from defendant, asking the officer about any developments and advising him that defendant was unsure of a detail in his statement. Schlesser related that he accompanied Lt. Fry to defendant's home at approximately 11:40 a.m. on the same date. Schlesser recounted the consensual search of the house and the discovery of blood and a shoe print in the

garage. Schlesser said that defendant's vehicle was parked in such a way that parking the victim's car in the garage would have been almost impossible.

The parties stipulated that, if called as a witness, William Wilson, a forensic chemist, would testify that bloodstains found on a blanket, two towels, and the car were consistent with the victim's blood and inconsistent with defendant's and that no blood was found on the baseball bat, the shirt, the shoes, or the blue jeans.

For the defense, Kim Richards, a Libertyville police officer, testified that he met his wife at the Waukegan Yacht Club to dine with Jack Amedio and his wife on October 12, 1990. At approximately 9 p.m. his group went into the bar area for a drink. Richards stated that he did not know defendant well and did not see him at the bar.

Detective Schlesser, who had testified previously, stated that Jack Amedio told the officer that he saw defendant some time between 8:30 and 9 p.m. Schlesser interviewed Robert Bjork, who stated that he had overheard defendant tell another person that the victim would not be joining him for dinner because she had other business. Bjork told Schlesser that he saw defendant sometime between 8 and 10 p.m. and that he could not be more specific.

Joanne Pertz, defendant's mother, testified that her pregnancy and delivery of defendant had been difficult, that defendant fell down the stairs and hit his head on a cement wall when he was 17 months old, that he suffered a third-degree burn from spilled coffee when he was four or five and also suffered paralysis and hives from the medication administered for the burn, that he was shot in the eye by a BB gun when he was eight, that he suffered frequent head injuries from playing ice hockey without a helmet, and that he had head, neck, and back injuries in an automobile accident when he was 19. Pertz also said that defendant had frequent headaches as a child, that he was moody and temperamental, that he had a short attention span, and that his father was a perfectionist who responded to lesser performances by yelling loudly.

Ronald Baron, a psychiatrist, testified as to his qualifications and experience. He described his dealings with defendant, which involved seven interviews of about an hour to an hour and a half, totaling nine hours. Based on his interviews and various tests, Dr. Baron testified as to conclusions he had reached regarding defendant's condition on the day of the offense. According to Baron, defendant suffered from mild hypoglycemia or low blood sugar, he showed little indication of psychosis, he had some evidence of an anxiety disorder, and he had minor problems with self-esteem. There was no evidence of a trau-

matic stress disorder. Dr. Baron said that defendant had an abnormal EEG, which indicated a temporal lobe seizure problem. The doctor diagnosed defendant as having a mild to moderate organic personality disorder with temporal lobe epilepsy.

Baron stated that defendant told the doctor that he had taken the prescription medications Seldane, Atarax, Darvocet, and Nuprin on the date of his wife's death.

Dr. Baron opined that defendant was suffering from the condition of organic personality disorder with temporal lobe epilepsy on the date of his wife's death. He explained that the disorder lasts a long period of time and does not go away spontaneously and that defendant had not been under treatment.

On cross-examination, Dr. Baron stated that he based his diagnosis of temporal lobe epilepsy in part on an abnormal EEG taken during a period of about an hour but that a second, 24-hour EEG was normal. The doctor admitted that all but one of the other symptoms constituting his diagnosis that defendant had temporal lobe epilepsy were reported by defendant and were subjective.

Defendant testified to his background and medical history. He indicated that he had been unable to "perform" sexually after being given medication for high blood pressure and that this caused friction in his marriage. Defendant related that after he married his wife, they bought a sailboat. He was an avid sailor, and she sailed on occasion. The membership in the yacht club was a Christmas gift to him from his wife. She was also active in the club but thought he spent too much time there.

Defendant explained that his home had a 2½-car garage and that three vehicles were generally parked at the house, including a company car parked on the driveway. He stated that the vehicle on the driveway forced him to enter and leave the garage at an angle.

Defendant stated that there was friction between his wife and him as to the division of household duties. They also had disputes about finances and boat expenses. Defendant said that a room was rented to Adam Clark at defendant's suggestion and that the arrangement was intended to be temporary. The victim became upset when the arrangement continued, but the situation resolved itself when Clark assumed responsibilities such as watching the house or letting out the dogs.

Defendant related that during the marriage his wife and he got into some "terrible" arguments, causing defendant to feel chest pain, dizziness, and headaches. If this lasted long enough, defendant said, he experienced a "whiteout" where his "vision would go white." According to defendant, he lost time, could not hear, and saw total

whiteness. Defendant denied that there had been physical violence during the marriage.

Defendant said that he called his wife at 6 p.m. on October 12. They talked briefly. His wife called him back at 6:30 p.m. to say that she was in a hurry and would call him later. His wife arrived home at 7:02 p.m., appearing upset and grouchy. Defendant summarized the ensuing argument and his physical response. Defendant stated that he told his wife that he had to leave. She asked him where he was going and hit him on the head with a hard rubber dog ball. Defendant chased the ball and saw a souvenir baseball bat. He brought the bat with him and said that she should use it if she really wanted to hurt him.

According to defendant, they continued arguing. When defendant again attempted to leave, she "jumped in front of" him. Defendant said that he grabbed her by the sleeve of the jacket and "threw her backwards." Defendant claimed that, at that time, he had a whiteout effect. When "things came back" to him, he saw the victim lying on the floor. He asked her whether she was all right and then saw blood on the floor under her head. Defendant stated that he bent down and saw blood on her nose and lips. He said that his wife did not move and did not appear to be breathing. He saw urine between her legs and said that her eyes were blinking and dilated. Defendant said that he got up to call for help but froze because he did not know whom to call.

Defendant stated that he decided that his wife was dead. He became panicky and thought he was going to be arrested. He decided to "make it look like an accident," picked up the bat, and struck her on the left side of the head. He said that he did not see anything and thought he should "make a mark" so he rolled her over and struck her "real hard" on the right side of the head.

Defendant testified that he thought that he had to get his wife out of the house so he put her into the trunk of her car. He returned to the house and cleaned up the blood with towels and a sponge mop. Defendant then put the bat in the car and started driving. He said that he felt nothing and was in a daze. When he found himself at a lake, he threw the bat out of the car window. According to defendant, he continued driving and found himself in a parking lot a mile from the house. He left the car there and ran home.

When defendant arrived home, he changed his clothes and washed his face. He said that he knew he had to get rid of his wife's purse and shoes so no one would know that she had been home. He also collected his own shoes, the towels, and his clothes. He then drove east-

bound on Route 176 and described the stops he made to dispose of items.

Defendant said that he then went to the yacht club because he thought he had to "have like an alibi or be seen by people." After he left the club at about 10:30 p.m., he sat in his truck near the bar for 45 minutes, then drove some more, stopping at a gas station for cigarettes and gas and at a White Hen for a Pepsi. He went home, could not go into the house, and drove again. Defendant stated that he got home at 1 a.m. and woke up Adam Clark. He described their efforts to look for his wife and the 4 a.m. visit to the police station to report her missing. Defendant testified to his calls to his wife's friends, to Bill McCaffrey's visit, and to his trip to the police station with McCaffrey. That night, defendant said, he was up all night, and kind of "half dozed" for a half hour.

Defendant testified regarding Lt. Fry's visit the next day. He said that he left for the police station with Fry at 3:30 p.m. and then described the interviews and the search for evidence. Defendant asserted that everything in his statement was true, except for the statement that the bat had been in the garage.

On cross-examination, defendant said that his wife had been lying in "a pool of blood" for 15 minutes before he hit her with the bat. He also said that 15 to 20 minutes passed between the time his wife arrived home and the time he pushed her. He testified that he dragged her body from the kitchen to the car and also said that his cleanup of the kitchen took only "a minute or two" and that he cleaned only the portion of the floor where his wife had been.

Daniel Wynn, a neurologist, testified to his training and qualifications. In response to a hypothetical question, he opined that a woman could have appeared unconscious as a result of a fall on quarry tile.

In rebuttal, Dr. Henry Lahmeyer, a psychiatrist, summarized his education and qualifications. He listed the documents that he had examined with reference to the instant case and stated that he had met with the defendant. Dr. Lahmeyer quoted defendant as having said that his wife tripped over her shoelaces or a chair when she fell. Defendant told the doctor that he did not call for help because he did not know the numbers to call and did not know he could call the operator.

Dr. Lahmeyer explained the nature of temporal lobe epilepsy. Based on his examination of defendant's EEGs, he stated that defendant's abnormality is not indicative of epilepsy. In the doctor's opinion, defendant did not suffer from temporal lobe epilepsy. In reaching this

conclusion, he read Dr. Baron's report of symptoms but could not find evidence in support of them.

Dr. Lahmeyer then explained the nature of organic personality syndrome which usually includes an organic lesion. Dr. Lahmeyer reviewed a CAT scan in this case and concluded that there was no evidence of such a lesion. Also, there was no evidence that the defendant suffered from organic personality syndrome on the night of the victim's death.

Dr. Lahmeyer discussed hypoglycemia and concluded that there was no basis for a finding that the defendant suffered from that condition on the night his wife died.

Lt. Fry was recalled as a witness. He stated that he retraced the route defendant took on the night the victim was killed. Using the most direct routes and adding in the walk from the place where the car was left to defendant's home, the trip took one hour and 13 minutes. The retracing was done on the same day of the week and at the same time of day as defendant's original drive.

Following deliberations, the jury returned a verdict of guilty of first degree murder. Defendant filed post-trial motions which were denied.

At a subsequent sentencing hearing Dr. Baron testified that his trial testimony was based on his examinations of defendant, his review of defendant's medical records, the police reports, the reports of other doctors, the laboratory reports, and conversations with the State's psychiatrist. Dr. Baron explained the principle of being "cognitively impaired." He stated that, in cases involving temporal lobe epilepsy, the use of Nuprin can lower the seizure threshold, as can sleep deprivation, hypoglycemia, and stress. He said that defendant had gone without sleep for 19 hours prior to the incident and had eaten no solid food because he was trying to diet.

Dr. Baron then explained organic personality syndrome, stating that, taken with the temporal lobe epilepsy, this condition influenced defendant's ability to think and reason at the time of the incident. The doctor opined that this resulted in defendant's mishandling of the situation and using excessive force in pushing the victim and in handling the resulting injury. Dr. Baron said that the defendant told him that he "couldn't think of who[m] to call, he couldn't remember any phone numbers, and he didn't think to look in the phone book. Didn't think to call the operator." Dr. Baron opined that it was unlikely that defendant would be involved in another violent crime.

Defendant presented several brief character witnesses in mitigation.

In explaining the matters considered in imposing sentence, the trial judge found that the verdict was amply supported by the evidence and stated that he agreed with the verdict. He noted that there were many good reasons to consider defendant's testimony to be untruthful. The judge also expressed disagreement with Dr. Baron's conclusions and diagnosis. At the conclusion of the hearing the judge sentenced defendant to 45 years' incarceration.

In his first two issues defendant challenges the trial court's rulings on two of the motions to suppress which he filed. Defendant contends that the trial court erred in denying his motion to suppress his statements and quash his arrest and in denying his motion to suppress evidence seized during several alleged consent searches. A trial court's ruling on a motion to suppress will not be overturned unless it is manifestly erroneous. *People v. Galvin* (1989), 127 Ill. 2d 153, 162.

An extensive hearing on the motions in question was conducted by the trial court. At this hearing, it was the trial court's duty to resolve conflicting evidence and to determine the credibility of the witnesses. (*People v. Case* (1991), 218 Ill. App. 3d 146, 154.) This court is required to defer to the findings of the trial court where that court has assessed credibility, demeanor, and all the relevant facts. (218 Ill. App. 3d at 154.) Here, the trial court's denials of the motions in question were based on its explicit findings that the State's witnesses were more credible than defendant's. From our review of the record we find that these denials were proper.

Defendant maintains that the consent he gave for the initial search of his house and of his pickup truck on October 14, 1990, was not voluntarily and freely given. The testimony of both Lt. Ronald Fry of the Libertyville police department and of defendant establishes that the officer was at defendant's home on October 14 at defendant's request to come and look at "something" in a bedroom closet. When Fry and Detective Schlesser arrived at defendant's home, defendant, by his own testimony, "invited" the officers inside. Fry testified that defendant wanted him to go upstairs immediately to check the bedroom closet and to correct a discrepancy regarding the shoes defendant had told the police that his wife had been wearing when she disappeared. Both defendant and Fry testified that Fry asked defendant to sign a consent form to allow the officer to look in the closet. Both witnesses testified that defendant questioned why he needed to sign the form, and both stated that Fry explained that it was because of the ongoing investigation of a missing person. Fry said that he told defendant he did not have to sign the form. Defendant's only protest

was that the form seemed unnecessary since he had asked the officers to come to his house.

The testimony was conflicting regarding whether the form was complete, except for defendant's signature, when it was presented to defendant. Fry testified that he thought he had completely filled out the form prior to handing it to defendant. Defendant maintained that it was not filled out until after he signed it but that it was completed prior to the search.

Janice Steber, a friend of defendant and his wife, was present at the time Fry asked defendant to sign the form. She did not see the form but assumed it was completed. Steber stated that the officer carefully explained why defendant needed to sign the form and that she understood from the explanation, as she believed defendant did, that the consent permitted a search of the entire house. After defendant signed the consent form Steber, defendant, and the two officers proceeded to defendant's bedroom to look in the closet. After looking in the closet, the four of them went into other areas of the house with defendant leading the way and explaining the function of each room. Contrary to defendant's testimony that he felt coerced into the search of the house, Steber stated that defendant appeared very cooperative. She compared the situation to a "real estate walk through."

■■ Whether consent is voluntary is a question of fact and depends upon the totality of the circumstances. (*People v. Dawson* (1991), 213 Ill. App. 3d 335, 340.) The question is to be determined by the trial court, and its determination will be accepted by the reviewing court unless clearly unreasonable. (213 Ill. App. 3d at 340.) Based upon the facts and the circumstances presented at the suppression hearing, we do not find the trial court's determination that the initial consensual search of defendant's house was voluntarily given to be unreasonable or manifestly erroneous.

Both Steber and Fry testified that, following the search of the house, Fry asked defendant to accompany him to the police station to go over what defendant had already told the police, in a place that offered more privacy. Steber stated that defendant was reluctant to accompany Fry but only because he did not want to leave while other officers were still in the house. He accompanied Fry only after Steber assured defendant that she and her husband would remain in the house.

Fry transported defendant to the police station in an unmarked automobile with defendant sitting on the passenger side of the front seat. When the officer arrived at the station, he parked the car in an unsecured area near the station and not in the garage area routinely

used for admission of arrestees. Defendant was not handcuffed, was not searched for weapons, and was not taken to the booking room. Rather, Fry took defendant to a conference room, the same room where police had spoken with defendant on the previous day regarding his wife's disappearance. The door to the conference room was not locked, no one was stationed outside the door, and the area could be exited through an unlocked door directly outside the conference room. Defendant acknowledged that he was familiar with that door and with the building in general, as he had been in the police station on 50 or more occasions in the past, in large part, in his official capacity with AT&T.

Defendant's consent for the search of his truck occurred while he was at the station. According to defendant, Fry presented defendant with a consent form, which defendant did not recall was filled out, telling defendant that the officer needed defendant's signature in order to look in his truck. Defendant said that Fry told him that the form was just like the other consent form defendant had signed. Defendant testified that he replied, "okay," and signed the form because he did not feel he could refuse the officer's request. Fry testified that he asked defendant's consent to search the truck and that defendant said that that would be no problem, so Fry filled out the form, and defendant signed it. According to Fry's recollection, the request to sign the form came after defendant had been given the *Miranda* warnings. According to defendant, the warnings came after the officer's request to search defendant's truck.

■ Defendant's version and the police's version of the events surrounding the request to search defendant's truck were somewhat conflicting. This court, however, will not substitute its judgment for that of the trial court where the evidence is conflicting. (*Dawson*, 213 Ill. App. 3d at 341.) Here, the trial court resolved the issue of whether defendant's consent to search his truck was voluntary in favor of the State. Because of the trial court's superior position in making an assessment of the witnesses' credibility, we must defer to this finding, absent an indication in the record that the decision was manifestly erroneous. (*People v. Torry* (1991), 212 Ill. App. 3d 759, 766.) We find no such indication here.

Defendant also contends that questioning occurred while he was in custody without probable cause. Additionally, defendant argues that he was not advised properly of his *Miranda* rights (*Miranda v. Arizona* (1966), 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 706-07, 86 S. Ct. 1602, 1612) before such questioning began. At the station defendant talked with Fry and Detective Chuck Bell for about an hour. Defend-

ant was very cooperative. After a short break the officers told defendant that his wife's car had been found with a female body inside the trunk. The officers then gave defendant his *Miranda* rights assuring defendant upon his inquiry that he was not under arrest. Defendant acknowledged that the officers said he was not under arrest. According to the testimony of the officers, defendant listened and read through the form setting forth his rights and then signed it. Defendant never invoked his right to remain silent or indicated that he did not want to continue the interview. The officers said that defendant never asked for an attorney; he just asked the officers if they thought he needed one to which they replied that it was his decision.

Defendant testified that the officers told him that he had to sign the *Miranda* form and that they never read or explained the document to him. It was defendant's testimony that he asked for a lawyer on several occasions and that the officers told him that he did not need one. Later, according to defendant, after he had made a number of incriminating statements, the officers informed him that it was his decision whether to get a lawyer. Defendant alludes to the fact that because he had been without sleep for 60 hours at the time of his interview and because of his susceptibility to "white outs" during stressful situations, his rights were violated. But, as the State points out, defendant never testified that he suffered a "white out" while with the police, and the police were not responsible for his lack of sleep.

It was the function of the trial court at the hearing on defendant's motions to suppress to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Galvin* (1989), 127 Ill. 2d 153, 163.) That the court found the testimony of the other witnesses more credible than defendant's testimony and did not draw the inferences that defendant would like it to have drawn does not mean the court ruled improperly.

Defendant refers to a number of facts from which he contends the court should have inferred that questioning occurred while he was held in custody without probable cause and without his being properly advised of his *Miranda* rights. For example, defendant implies that he was placed in a custodial situation at the time the police drove him to the station since he had no means of getting home if he so chose. The evidence showed, however, that defendant's house was less than one mile from the station, a distance defendant could have easily reached by foot as revealed by his testimony at trial that he had run a mile to get home after leaving the decedent's car in a parking lot.

Defendant also implies that the police took advantage of his lack of "street" sense or knowledge of police procedures to obtain evidence against him. Defendant points out that he had never been arrested nor been in police custody before. However, defendant ignores his own testimony that he had been friends for years with a number of the officers at the station and used to accompany them in their squad cars when they were on patrol, giving him insight into police procedures unavailable to most laymen or criminal suspects. As the State points out, defendant refers to these friendships to lead this court to believe that they were exploited to induce his statement, ignoring, on the other hand, his own trial testimony that the officers acted in an official manner that tended to stifle his desire to tell the truth. Additionally, defendant's claim that he was unfamiliar with police procedures is weakened by his own assertions in his brief regarding the lengthy conversation he had with Lt. Fry and Detective Bell regarding the distinctions between "waiving" and acknowledging his rights.

Determining whether defendant voluntarily agreed to the initial search of his residence and the search of his truck and whether he voluntarily answered the police's questions regarding his wife's disappearance requires bearing in mind that defendant was trying to make the police believe his wife had been murdered in a robbery attempt. To this end, it was necessary for him to give the police the impression that he wanted to cooperate fully and participate in their investigation. It is important to note that it was defendant who initially contacted the police when he reported his wife missing; it was defendant who contacted the police again with further information and went to the police station of his own free will; it was defendant who invited the police to come to his house; and it was defendant who signed the consent form to search his house and then led the officers upstairs and through the house.

■ As the State points out, defendant's voluntary decision to cooperate was not rendered custodial merely because the officers interviewed him at the police station or because he was a suspect. (*Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714.) The evidence showed that the location and setup of the conference room at the police station were not unduly oppressive nor was the method of questioning regarding the missing person's report of an interrogating nature. We are of the opinion that at the time of the interview a reasonable innocent person of defendant's age and general experience, which experience included numerous visits to the police station, would have believed that he was free to leave the station if he so chose. Given his reasons for cooperating, defendant could

not have believed he was in custody until the officers advised him of his *Miranda* rights.

We choose not to prolong our discussion of this issue by commenting on every single portion of testimony which defendant claims illustrates that the court's rulings were erroneous. Our review of the record on the suppression hearing satisfies us that the trial court's denials of the motions to suppress in question were proper. The evidence presented was sufficient to support the trial court's findings that the method of investigation employed by the police was performed in a professional manner and that defendant's rights were not violated.

Defendant's third contention is that the trial court erred in denying his motion to quash the search warrant which was issued for the search of his wife's automobile. Defendant argues that the affidavit in support of the warrant failed to show probable cause.

■ Initially, defendant contends that reversal is required because the trial court failed to state findings of fact and conclusions of law in denying defendant's motion to quash the search warrant as required by section 114—12(e) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 114—12(e)). This requirement serves the salutary purpose of enlightening the appellate court as to the evidence and reasoning relied upon below and thereby facilitates review. (*People v. Bury* (1990), 199 Ill. App. 3d 207, 209-10.) In the instant case, only a minute order pertaining to the court's denial of defendant's motion appears in the record. Such an order traditionally does not set forth the reasoning relied upon by the trial court. Nonetheless, our review has been facilitated by comments the court made on the record in denying defendant's motion to quash the warrant, and, therefore, reversal is not required on the basis of section 114—12(e).

Defendant challenges the propriety of the search warrant stating that the affidavit relied upon for its issuance was "totally devoid of probable cause." We do not agree.

The affidavit stated:

> "Your affiant, Detective Charles Bell, of the Libertyville Police Dept. states that he has been a police officer for the past eighteen (18) years. Your affiant states that he had occasion to investigate a missing person report filed by Thomas Pertz on October 13, 1990 at 3:56 a.m. According to Thomas Pertz his wife, Jane Casey-Pertz, had last been seen Friday October 12, 1990 at 7:00 a.m. A bulletin was then put out for Mrs. Pertz as well as a 1988 Cadillac with an Illinois registration number of JC 1083.

On October 14, 1990 at approximately 5:30 a.m. the above vehicle was found at 1117 S. Milwaukee in a parking lot. Detective Bell observed the trunk area of the vehicle and noticed reddish stains that appeared to be blood. He also noticed reddish stains around the bumper and taillight area of the automobile. Said automobile was then towed to the Libertyville Police Department where it remains."

Section 108—3(a) of the Code of Criminal Procedure of 1963 provides for courts to issue warrants "upon the written complaint of any person under oath or affirmation which states facts sufficient to show probable cause." (Ill. Rev. Stat. 1989, ch. 38, par. 108—3(a).) Whether probable cause was shown for the issuance of a search warrant must be determined upon the basis of the verified allegations of the complaint for the issuance of the warrant. (*People v. Atwood* (1990), 193 Ill. App. 3d 580, 585.) To support the issuance of a search warrant, facts must be related which would cause a reasonable man to believe that a crime had been committed and that evidence of the crime was in the place to be searched, and the court must interpret and test the supporting affidavit in a commonsense and realistic fashion. (*People v. Bauer* (1981), 102 Ill. App. 3d 31, 37.) A court of review, in evaluating the validity of a warrant, may consider only that information actually brought to the issuing magistrate's attention. *People v. Greer* (1980), 91 Ill. App. 3d 304, 305-06.

■ The affidavit in this case stated that the affiant, a police officer for 18 years, had investigated a missing person's report and that police had been seeking a specific automobile. The affidavit also stated that the car had been found in a parking lot, nearly 48 hours after the time the individual had last been seen by her husband, and that reddish stains on the trunk area, around the bumper, and around the taillight of the car appeared to be blood. These facts were sufficient for a reasonable man to believe that a crime had been committed and that evidence of the crime was in the trunk. We do not agree with defendant that the affiant needed to allege any special expertise or training to substantiate his opinion that the stains appeared to be blood. It does not take any expertise for a reasonable person to infer that reddish stains found on an automobile, which had been reported missing at the same time as the person last seen driving that automobile, were blood.

In our view, the issuing judge interpreted the supporting affidavit in a commonsense and realistic fashion, and, therefore, the trial court did not err in denying defendant's motion to quash the search warrant.

Defendant's next contention is that the trial court erred in limiting the cross-examination of the State's forensic pathologist, Dr. Larry Blum, and the direct examination of defendant's expert neurologist, Dr. Daniel Wynn.

■ Defendant first argues that he should have been permitted to cross-examine Dr. Blum as to the degree of violence associated with domestic violence situations and, additionally, to have been allowed to cross-examine the doctor as to other possible causes of death. Initially, we are in agreement with the State that, but for the cross-examination of Dr. Blum as to domestic violence, the remainder of this issue is waived for failure to preserve it in defendant's post-trial motion. *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

Cross-examination is limited to the scope of direct examination and to matters that explain, qualify, discredit, or destroy the witness' direct testimony. (*People v. Franklin* (1990), 135 Ill. 2d 78, 97.) The scope of cross-examination is within the sound discretion of the trial court, and a court of review should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Witt* (1992), 227 Ill. App. 3d 936, 948.

During cross-examination of Dr. Blum, defense counsel questioned the doctor regarding the amount of violence involved in cases of domestic violence. The trial court sustained the State's objections to this line of questioning. During his direct examination, Dr. Blum, a pathologist, explained his autopsy procedures and expressed an expert opinion on the cause of death of defendant's wife. The degree of violence in domestic violence situations was not raised in his direct testimony, nor did it relate to his direct testimony as to the cause of death. We note that, in denying this issue in defendant's post-trial motion, the trial court stated emphatically that such questioning was outside the scope of Dr. Blum's direct testimony and that defendant could have presented his domestic violence theory by calling the doctor as a witness during defendant's case in chief. We conclude that the trial court acted properly in limiting defendant's cross-examination of Dr. Blum.

Defendant also argues that the trial court erred in restricting his direct examination of Dr. Daniel Wynn, his expert neurologist, by not permitting him to ask about the vital signs that would typically be present in a person unconscious from a head injury. This issue was not raised in defendant's post-trial motion and, therefore, is waived on appeal. *Enoch*, 122 Ill. 2d at 186.

■ Even if the issue is not waived, however, the court properly restricted this examination because it was not within the context of the hypothetical posed to the witness. That hypothetical was based on

defendant's theory of defense that after he pushed his wife, causing her to fall and strike the back of her head on the kitchen floor, he detected no vital signs. Defendant's question regarding the vital signs of other individuals in an unconscious state did not pertain to the hypothetical posed. Moreover, when defendant then asked Dr. Wynn what the vital signs would be of the victim in his hypothetical, he was asking the witness to speculate as to what the decedent's vital signs would have been as a result of her injury. An expert will not be permitted to guess or state a judgment based on mere conjecture. (*People v. Seaman* (1990), 203 Ill. App. 3d 871, 881.) It was not error, therefore, for the court to have limited Dr. Wynn's testimony in this manner.

■ Defendant also contends that the trial court erred in restricting the testimony of his expert witness, psychiatrist Ronald Baron. Initially, defendant avers that the number of objections by the State during defendant's direct examination of Dr. Baron was obstructive and prejudicial to defendant's case. Defendant cites no authority for his position that the number of objections alone can establish prejudice. Without some direct showing that the State's objections were interposed solely to obstruct the presentation of Dr. Baron's testimony, any argument of prejudice based on the number of times the State objected is without merit.

Next, defendant contends that the trial court erred in disallowing Dr. Baron's opinion regarding whether defendant responded honestly to questions posed by the doctor during his interviews with defendant. The outcome of defendant's trial rested, in large part, on whether the jury believed defendant's version of the sequence of events on the night of the offense. The question of defendant's credibility was a concept within the common and ordinary understanding of the jury. If an expert's opinion does not present a concept beyond such understanding, the expert's testimony regarding a witness' credibility is properly excluded. *People v. Nix* (1985), 133 Ill. App. 3d 1054, 1059.

■ A good portion of the interviews conducted by Dr. Baron pertained to the offense itself and to defendant's account of his alleged physical conditions which existed on the night of the offense. The doctor's opinion as to defendant's honesty during the interviews would have had a direct bearing on these aspects of the interviews. His opinion would have been an expression of his belief in defendant's testimony, would have lent his professional credibility to defendant's self-serving declarations, and would have conferred upon them a legitimacy which could have unfairly affected the credibility of the case. (*People v. Slago* (1978), 58 Ill. App. 3d 1009, 1016.) We conclude

that the trial court did not err in disallowing the doctor's testimony as to the truth of defendant's statements to him.

■■■ Defendant also asserts that the trial court erroneously restricted Dr. Baron's testimony regarding whether defendant was "faking" his condition of temporal lobe epilepsy. Defendant maintains that the trial court's sustainment of the State's objection was imprecise and may have confused the jury. We do not agree. Prior to the State's objection, Dr. Baron fully explained why he did not believe defendant was faking his condition. The objection was sustained only as to the "rambling" nature of the doctor's response, and the only portion of the answer that was stricken was "in terms of what anyone else may have known." Immediately prior to the objection, Dr. Baron stated:

> "Lastly, I didn't know that he had temporal lobe epilepsy, so I don't know how he could have known it. Nobody knew he had temporal lobe epilepsy."

The trial judge struck only that part of the doctor's response which referred to what was known by anyone else. This order was clear, could not have confused the jury, and did not restrict Dr. Baron's opinion as to whether defendant was faking his condition of temporal lobe epilepsy.

Next, defendant argues that the trial court erred in sustaining the State's objection as to whether organic personality disorder would be apparent to a layman. Defendant contends that such testimony was important to rebut the testimony introduced by the State that defendant had appeared "normal" shortly after the incident. We agree with the State that this argument has been waived.

■■■ The basis defendant presents here for why the court should not have sustained the State's objection is not the same basis defense counsel gave at trial. When the prosecutor objected to defense counsel's question and the parties went to a sidebar, the trial judge asked counsel, "What does that have to do with the case?" Counsel replied that his question was a "standard foundation" question in terms of psychiatric testimony and that it would be a basis for an opinion on the question of intent. This is not the basis or theory for allowing the testimony which defendant has raised on appeal. A theory which is inconsistent with that which is espoused in the trial court may not be considered on review. (*Monroe County Water Cooperative v. City of Waterloo* (1982), 107 Ill. App. 3d 477, 480.) Accordingly, we will not consider the theory which defendant proposes here as to why the court should have allowed the opinion testimony in question.

■■ Defendant also contends that the trial court erred in not allowing Dr. Baron to testify as to possible adverse reactions of the drug Seldane which, according to defendant's testimony, he had ingested twice during the day of the offense. Except for defendant's word, there was no proof that he had taken Seldane that day. No testing was performed to determine whether there was Seldane in his blood. Therefore, how the medication affected defendant or whether it affected him negatively on that date was speculative. The doctor could not formulate an opinion based upon a reasonable degree of medical certainty as to how Seldane affected defendant's ability to make proper judgments on the night in question. The court did not err in disallowing Dr. Baron from testifying regarding how the drug Seldane may have possibly affected defendant on the night of the offense.

Finally, defendant argues that the trial court erred in refusing to allow Dr. Baron to testify as to defendant's intent on the night in question. Defendant maintains that his constitutional right to present a defense was denied when the court would not allow direct testimony that defendant's cognitive functions were so impaired on the night of the death of defendant's wife as to negate his intent. We do not agree.

The jury heard Dr. Baron testify as to the tests he conducted, the results of those tests, and his opinions concerning defendant's personality. Additionally, the doctor read to the jury the various traits characteristic of one having organic personality disorder and also testified as to the dosages of the medications defendant told the doctor he took on the date of the offense. The jury also heard the doctor express his opinion, based upon a reasonable degree of medical and psychiatric certainty, that defendant was suffering from organic personality disorder with temporal lobe epilepsy on the night of his wife's death. It was permissible for Dr. Baron to give this opinion, but it was not permissible for him to express his opinion as to defendant's state of mind on the night of the incident.

■■ Dr. Baron was not with defendant nor did he observe defendant on the night of his wife's death. Thus, it would have been impossible for him to opine with a reasonable degree of medical and psychiatric certainty whether defendant had intended his act of hitting her in the head with a baseball bat. The doctor's testimony as to defendant's mental state was meant to show that defendant lacked the intent and that he acted recklessly. However, recklessness is not a state of mind which requires expert testimony. Whether defendant appreciated the risk involved when he killed his wife or whether he pan-

icked were questions for the jury and not issues for testimony by an expert psychiatrist.

The question of defendant's state of mind at the time of the crime was a question of fact to be determined by the jury (*People v. Elder* (1991), 219 Ill. App. 3d 223, 225), which was charged with taking this evidence along with all the other evidence presented to determine whether defendant had the intent to kill his wife. Allowing Dr. Baron to testify as to defendant's intent would have usurped the province of the jury. We conclude that the trial court did not err in limiting Dr. Baron's testimony.

In his sixth contention defendant argues that the trial court erred in handling the State's motion *in limine* regarding the testimony of psychiatrist Ronald Baron. Defendant first maintains that the trial court should not have entertained the State's motion to reconsider the court's denial of the State's first motion *in limine*, which sought to exclude the testimony of Dr. Baron. That motion had been denied without prejudice so that the State could raise the issues set forth therein at the time of trial. Defendant asserts that, because the State relied on arguments made in its first motion when it presented its second motion and did not present any new case law, reconsideration of the court's ruling should have been barred.

▉▉▉ Contrary to defendant's assertion here, the State's new motion *in limine* did raise new matters in the form of a report from Dr. Baron which the State received six days prior to trial and two days prior to the filing of its new motion *in limine*. That report was attached, along with Dr. Baron's previous reports, to the State's motion. A motion *in limine*, like any other interlocutory order, is subject to reconsideration by the court (*Romanek-Golub & Co. v. Anvan Hotel Corp.* (1988), 168 Ill. App. 3d 1031, 1040), and, therefore, entertainment of the State's second motion *in limine* which, in effect, was a motion to reconsider, was proper.

▉▉▉ As to the other matters which defendant raises in this issue, *i.e.*, defendant's mental state on the night defendant's wife died and Dr. Baron's opinion that defendant's judgment was so impaired that his intent was negated, we do not believe the court erred in limiting the doctor's testimony in this regard. We have already set forth reasons for this belief in our discussion of the previous issue.

Additionally, the court's expansion of its earlier rulings to limit the doctor's testimony in the manner stated above was based on the court's determination that certain opinions in the doctor's reports were not based upon a reasonable degree of medical or psychiatric certainty. We agree. The reports contained such speculative state-

ments as defendant "may have been organically impaired"; patients who have epilepsy "may be influenced by Seldane *** as to produce a seizure"; defendant "has a history of brain injury and an abnormal EEG," and "[t]his may be the way it shows itself," *i.e.*, in explosive behavior. Such statements did not provide the proper foundation for an opinion that these various conditions were present on the night of the offense and that they so impaired defendant's judgment as to negate his intent.

Moreover, as the doctor himself stated in his last report, most of his opinions regarding defendant's defective judgment on the night of his wife's death and whether his judgment was so impaired that any murderous intent was negated were made with the idea that the events as defendant related them to the doctor were true. Without observing the crime or defendant on the night in question so as to know that defendant's accounts were truthful, the doctor's opinion as to defendant's state of mind on that night would have been mere speculation. The court did not err in its disposition of the State's motion *in limine*.

Defendant next contends that the prosecutor's comments during rebuttal argument were highly prejudicial, depriving defendant of a fair trial. According to defendant, the prosecutor repeatedly called defendant a liar, misstated the law, misstated certain facts, and used grandstanding techniques. The record reveals that defendant failed to object to any of these allegedly prejudicial comments at trial, and, thus, he has waived any objection here. *People v. Daniels* (1987), 164 Ill. App. 3d 1055, 1082.

Defendant maintains, however, that the remarks were preserved for appeal because they were raised in his post-trial motion. That motion, however, did not set forth the specific remarks constituting error. Rather, it stated only that comments during the prosecution's closing arguments were "highly prejudicial, and represented 'plain error' and therefore deprived the defendant of a fair trial." The failure to object at trial to allegedly improper remarks made by the State during closing argument or to raise those objections with a reasonable specificity in a post-trial motion constitutes a waiver of any error for purposes of appeal unless the remarks were so egregious and prejudicial that they constituted a material fact in the defendant's conviction or otherwise prevented him from receiving a fair trial. *People v. Johnson* (1991), 220 Ill. App. 3d 550, 561.

■■ We have carefully reviewed the comments of which defendant complains here and find that they were based on the evidence, were reasonable inferences from it, or were provoked or invited by

defense counsel's argument. Such comments were proper (*People v. Smith* (1991), 222 Ill. App. 3d 473, 484) and could not, therefore, be said to have prevented defendant from receiving a fair trial.

Next, defendant contends that the trial court abused its discretion in allowing certain photographs to be published to the jury and to be sent back with the jury for its consideration during deliberations. Defendant maintains that the photographs were gruesome and prejudicial.

The photographs of which defendant complains, however, were not originally made a part of the record on appeal. After the State filed its brief and pointed out that the photographs were missing, defendant filed a motion in this court to supplement the record with the photographs in question. Defendant asserted in that motion that until he read the State's brief he was unaware that the photographs had been omitted from the record. Over the State's objection, this court allowed defendant's motion to supplement the record with the photos. In allowing defendant's motion to supplement, this court also allowed the State to file a supplemental brief. (See *Denniston v. Skelly Oil Co.* (1977), 47 Ill. App. 3d 1054, 1070.) Despite our order to allow defendant's motion to supplement, we have reconsidered this order and decided to disallow the supplemental record. Motions made in the reviewing court are open for reconsideration. *People v. Nichols* (1986), 143 Ill. App. 3d 673, 676.

The appellant in a criminal case bears the responsibility of providing a complete appellate record for review. (*People v. Blake* (1985), 130 Ill. App. 3d 948, 956.) Defendant had the opportunity, as the State points out, to examine the record and to ensure that it presented his positions and that no pertinent material was omitted. Presumably, defendant reviewed the record in preparing his brief. That he would present the argument he has raised here regarding the gruesomeness of the photos without making certain the photographs were included in the record in the first place is incomprehensible. Obviously, this court would have to view the photographs to determine if the trial court acted properly in allowing the photos to be published to the jury.

After reviewing the briefs and arguments of the parties as well as the trial record, we conclude that permitting defendant to supplement the record as our original order did here sets a dangerous precedent for allowing, as the State so aptly expresses, "piecemeal creation of the record, with supplemental briefing and rebriefing, all to the derogation of the appellate process." Accordingly, we reverse

our order allowing defendant to supplement the record with the photographs in question.

When the record presented on appeal is incomplete, this court will indulge in every reasonable presumption favorable to the judgment from which the appeal is taken, including that the trial court ruled or acted properly. (*People v. Majer* (1985), 131 Ill. App. 3d 80, 84.) Any doubt arising from the incompleteness of the record will be resolved against the appellant. (131 Ill. App. 3d at 84.) Defendant's failure to include the photographs in the record in the first instance precludes our examination of them, and without examining the photographs themselves, we must presume that the court ruled properly in allowing the jury to view and consider the photos.

Parenthetically, we note that the photographs were probative of defendant's theory that his wife was rendered unconscious by a one-millimeter "defect" on the back of her head and that such an injury created a pool of blood, leading him to believe she was already dead when he struck her with the baseball bat. Photographs that are relevant to establish any fact in issue are admissible despite their gruesome or disgusting nature. (*People v. Lucas* (1989), 132 Ill. 2d 399, 439.) Some of the valid reasons for admitting photographs of a decedent include to prove the nature and extent of injuries and the force needed to inflict them; the position, condition, and location of the body; the manner and cause of death; or to corroborate the testimony of a pathologist or other witness. (*People v. Henderson* (1990), 142 Ill. 2d 258, 319-20.) These reasons existed, here, and, therefore, the trial court did not abuse its discretion in allowing the photos to be published to the jury and sent back with it during deliberations.

Next, defendant contends that the trial court erred in allowing the State to question the defendant's expert psychiatrist, Dr. Ronald Baron, about the exact dollar amount of his fee. Defendant asserts that the error unduly prejudiced the jury's perception of Dr. Baron's testimony. We do not agree.

Contrary to defendant's assertions, here, the State did first ask Dr. Baron if he was being compensated by defendant and at what rate. In response to the State's inquiry as to whether he was being paid to testify, the witness emphasized that he was being paid for his time and not for his testimony. Dr. Baron stated that he was billing defendant $150 an hour for his consultations with defendant and for his appearance in court. Dr. Baron further testified that the amount already billed to defendant amounted to $4,000.

On redirect examination, Dr. Baron testified regarding the rate of compensation he normally charged his patients. That charge

amounted to $110 for 45 minutes. According to Dr. Baron, the normal charge for psychiatric services in Lake County was between $100 and $125 for 45 minutes. Also, on redirect examination, the doctor related that he had, on past occasions, testified both as a witness for the court and for the Lake County State's Attorney's office and that, on those occasions, he had been compensated for his time.

The prosecutor maintained that her question regarding the amount Dr. Baron had been paid was not aimed at showing bias but to show that he was being paid to testify. That he was being paid, however, did not establish that his testimony regarding defendant's condition was ill-founded. The jury heard the witness state, both on cross-examination and redirect examination, that he was being compensated for his time and not his testimony and that he was compensated whenever he spent time testifying, whether on behalf of the defendant or on behalf of the State.

A medical expert can be questioned about fee arrangements. (*Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 408.) Given Dr. Baron's testimony, we do not believe that the prosecutor's single question regarding the total amount the doctor had billed defendant for his services went beyond the permissible bounds of cross-examining a medical expert regarding fees. We conclude that the State's question did not prejudice the jury's perception of the doctor's testimony.

In his tenth contention defendant asserts that the trial court erred in giving the State's instruction No. 8, defining "knowledge," and instruction No. 11, pertaining to the completion of the verdict forms. The State's instruction No. 8 (Illinois Pattern Jury Instructions, Criminal, No. 5.01B (2d ed. Supp. 1989)) (hereinafter IPI Criminal 2d No. 5.01B), defined the concept of "knowledge." According to defendant, the instruction was unnecessary since the language of count II of the indictment was clear and did not need any explanation. Count II of the indictment charged defendant with first degree murder in that

> "defendant without lawful justification, pushed Jane Casey-Pertz and struck Jane Casey-Pertz with a baseball bat, *knowing* such acts created a strong probability of death to Jane Casey-Pertz *** in violation of Section 9—1(a)(2) of Chapter 38 of the Illinois Revised Statutes ***." (Emphasis added.)

The jury had been instructed that defendant could be convicted of first degree murder if defendant, in performing the acts which caused the death, knew that such acts created a strong probability of death. The State's instruction No. 8 explained:

"A person knows the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of such a nature or that such circumstances exist."

The instruction also explained:

"Knowledge of a material fact includes awareness of the substantial probability that such fact exists."

We agree with the State that the instruction was essential in light of the defense presented. It was defendant's testimony that when he struck his wife twice in the head with a baseball bat, he did not know that this conduct would cause her death because he thought she was already dead. Given defendant's testimony, it was important that the jury understood that the concept of knowing that circumstances existed included a substantial probability that they existed. As the State correctly points out, it was not necessary that defendant was certain that his wife was alive when he hit her. As long as there was a substantial probability that she was alive, defendant could be charged with knowledge that his conduct would kill her.

This was not a case where the term "knowledge" did not need explanation because its plain meaning was within the jury's common understanding. (Cf. People v. Powell (1987), 159 Ill. App. 3d 1005, 1013.) The concept that knowledge of a circumstance can include the substantial probability that the circumstance exists is not within the plain meaning of the term "knowledge." Since that concept was crucial to the outcome of the case, an instruction was necessary. Parenthetically, we note that the Committee Note to IPI Criminal 2d No. 5.01B (Supp. 1989), the State's instruction No. 8, states that this instruction should be given only when the conduct at issue is the conduct described by the statute defining the offense. Such was the situation here. It was not error for the trial court to tender the instruction to the jury.

Defendant also contends that the State's instruction No. 11, which directed the jurors how to complete the verdict forms, was confusing because it failed to explain that the jury could find defendant guilty of both counts of first degree murder, guilty of either count I or count II of first degree murder, guilty of involuntary manslaughter, or not guilty. First of all, we observe that the record contains other instructions besides instruction No. 11 which explained to the jury in detail the various verdict choices the jury had. Given the comments made by the court and the prosecutor at the jury instruction conference and the fact that the record appears to contain only those instructions noted as "given" at the conference, we presume the jury was properly instructed regarding the verdict choices and the manner in which

the verdict forms were to be completed. Additionally, the verdict forms themselves directed the jury that, as to each count of first degree murder, it was to find the defendant not guilty, guilty of first degree murder, or guilty of manslaughter.

■■■ We note that defendant failed to object on the record to the State's instruction No. 11 and also failed to offer an alternative instruction. The failure to present to the trial court a ground of objection to a jury instruction results in the waiver of the objection. (*People v. Waisvisz* (1991), 221 Ill. App. 3d 667, 676.) Also, the failure to tender an alternative instruction operates as a waiver. (*People v. Duffie* (1990), 193 Ill. App. 3d 737, 742.) Defendant relies on a comment made by the prosecutor at the hearing on defendant's post-trial motion to show that an objection was made by defendant to the instruction at a preliminary instruction conference held without a court reporter. This is an inadequate method of preserving an objection. Nevertheless, the prosecutor's comment to which defendant refers indicates that defense counsel, while apparently objecting off record to the instruction, did eventually acquiesce to the instruction because he had no alternative instruction to offer.

We conclude that the trial court did not err in tendering State's instruction No. 11 to the jury and that any alleged confusion was cured by other instructions pertaining to the verdict choices and by the verdict forms themselves.

■■■ Finally, defendant contends that he was denied a fair trial by the court's failure to instruct the jury that the State was required to prove the absence of a mental state required for involuntary manslaughter in order to obtain a conviction of first degree murder. Defendant admits that he made no objection on this basis at trial or in his post-trial motion but that such a failure constitutes plain error. Defendant not only has waived consideration of this contention (*People v. Enoch* (1988), 122 Ill. 2d 176, 186) but also has failed to show any error, "plain" or otherwise. The record shows that the offenses of both involuntary manslaughter and first degree murder and their requisite mental states were fully explained in instructions offered by the State and defendant. These instructions correctly stated the applicable law, and nothing more was required. We find no error stemming from defendant's claim of inadequate jury instructions.

In his next contention defendant asserts that the State's evidence was insufficient to prove him guilty beyond a reasonable doubt of first degree murder and that his conviction should be reduced to involuntary manslaughter. Defendant sets forth his position that in killing his wife he acted recklessly and without the mental state required for

first degree murder and cites the particular physical evidence presented to support this position.

A criminal conviction should not be overturned on the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. (*People v. Harris* (1992), 228 Ill. App. 3d 204, 210.) The standard for reviewing a conviction which is challenged on the sufficiency of the evidence is whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Dent* (1992), 230 Ill. App. 3d 238, 242.) In weighing the evidence, the trier of fact is not required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. (*People v. Campbell* (1992), 146 Ill. 2d 363, 380.) Where the evidence is capable of producing conflicting inferences, the matter is best left to the trier of fact for proper resolution. 146 Ill. 2d at 380.

▮▮▮ In the instant case, sufficient evidence was presented to show that defendant intentionally killed his wife when he struck her twice in the head with a baseball bat. Defendant admitted performing these acts but repeatedly claimed that he thought his wife was already dead after he pushed her, causing her to fall and strike her head on the kitchen floor. Believing she was dead, he then struck her with the bat in an attempt to fabricate a cover-up. Defendant's claim that he thought his wife was dead when he saw her lying in a pool of blood on the floor was disproved, as the State points out, by the pathologist's testimony that the "defect" in the back of the victim's head, which allegedly created the pool of blood, was very superficial, "a little tiny opening," and would not have bled very much.

Additionally, defendant claimed that he was extremely distraught as he disposed of the evidence and the body. This claim, however, was discredited by matters of timing. Defendant had told Lt. Fry and Detective Bell that he had driven around aimlessly before disposing of the evidence and then parking his wife's car to walk back to his residence. Fry and Bell traced the route defendant told the officers he had taken. The trip took an hour and 13 minutes. The evidence had shown that defendant's wife was alive at 7:30 p.m. and that defendant was seen at the yacht club on the night of the offense at 8:30 p.m. Given this time span and the time it took the officers to retrace defendant's route, defendant would have had to have worked efficiently with deliberate precision to complete the murder, change his clothing, clean the kitchen, dispose of the body, and scatter the evidence.

That the murder was intentional was further shown by defendant's behavior at the yacht club. Witnesses testified that while at the club defendant maintained a wholly normal facade, drinking and talking with friends, and agreeing to discuss some future plans with his wife. Additionally, he disturbed several people to create an image of a husband concerned about his wife's disappearance.

That the jury inferred from the foregoing evidence that defendant had intentionally killed his wife was not an improper resolution. Accordingly, we find that, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendant guilty of first degree murder beyond a reasonable doubt.

In his twelfth contention defendant argues that his sentence of 45 years was excessive in light of the facts and circumstances of the case and of defendant's lack of any prior criminal history. It is evident, however, from the trial judge's statement on the record that he considered, as a mitigating factor, that prior to the murder of his wife defendant had been a law-abiding person who was well respected by friends and family. That the judge did not specifically mention the other mitigating factors such as defendant's service in the armed forces, his long history of employment with the telephone company, and the alleged verbal provocation by his wife prior to her death does not mean the court ignored these factors, as defendant avers. Where mitigating evidence is before the court, it is presumed that the judge considered the evidence absent some indication to the contrary. *People v. Raue* (1992), 236 Ill. App. 3d 948, 952.

Here, the judge specifically pointed out that he had reviewed the evidence set forth in the presentence investigation report and in the social history, both of which contained the mitigating factors defendant claims the judge ignored. Additionally, the judge pointed out that in arriving at an appropriate sentence it was his responsibility to weigh the evidence and the factors in mitigation and in aggravation. Nothing in the record, therefore, indicates that the judge failed to properly consider the mitigating factors.

Sentencing is a matter of judicial discretion, and a sentence is not to be altered on review unless that discretion is abused. (*Raue*, 236 Ill. App. 3d at 952.) A trial judge's decision regarding sentencing is given great deference and weight. (*People v. Chatmon* (1992), 236 Ill. App. 3d 913, 936.) Considering the brutality of this crime and, as the judge pointed out, defendant's conscious decision regarding the weapon to use, *i.e.*, to seek out and find a baseball bat, as well as his decision where to hit his wife with that weapon, *i.e.*, to bash her at least twice in the head, to make her murder appear to be the result of

a robbery, we cannot say that defendant's sentence was an abuse of discretion.

Next, defendant contends that he was denied a fair sentencing hearing when the trial court failed to allow certain testimony from psychiatrist Ronald Baron. During Baron's testimony, which was offered in mitigation, the doctor testified, as he had at trial, that defendant suffered from temporal lobe epilepsy and organic personality disorder. It was Baron's testimony that these conditions impacted on defendant's ability to think and reason at the time of the commission of the offense. The doctor testified that there were three instances on the night of Jane Casey-Pertz's death when these two conditions impaired defendant's cognitive abilities: first, when defendant's argument with his wife escalated to violence; second, when he concluded that his wife was dead after falling and striking her head; and third, when he decided to attempt a cover-up rather than calling for help.

Baron was asked if the defendant's "cognitive functions were impaired to such an extent that it would have negated Mr. Pertz's ability to act either intentionally or knowingly at the time of his wife's death." The State objected, arguing that the question went to defendant's state of mind and that testimony to this effect was too prejudicial to allow in. The court did not sustain the State's objection on this basis. Rather, the court stated that it had no problem with defense counsel's area of inquiry but with the framework in which the question was asked.

The record shows that defense counsel did, in fact, eventually change the form of the question. Baron was asked if during the three instances, or steps, previously described by the doctor, *i.e.*, when defendant's cognitive abilities were impaired on the night of the offense, defendant "intentionally or knowingly acted through each of those three steps." The doctor was allowed to give his opinion, stating that defendant's "capacity to think was impaired through the entire thing." Thus, we fail to see how defendant was prejudiced by the court's sustainment of the State's objection to defense counsel's initial question regarding defendant's state of mind at the time of the offense.

Defendant also complains of the court's failure to allow Dr. Baron to answer a question which asked his opinion as to "whether Mr. Pertz contemplated that his criminal conduct at the time of the commission of the conduct would have caused serious physical harm to his wife." Defendant maintains that the doctor's opinion was not being offered to impinge on the jury's verdict, as the trial court ruled, but

to aid the court in reaching a decision about the length of defendant's sentence. We are of the same mind as the trial court, however, that such an opinion was not a proper consideration for sentencing. The question related directly to defendant's mental state at the time he committed the offense and that was the precise issue which the jury resolved against him. Defendant's sentence was to be imposed based on the assumption that the jury's verdict was correct. Defendant's question attempted to invade that verdict. The trial court's decision not to allow the question was correct.

Additionally, defendant asserts that Dr. Baron should have been allowed to give his expert opinion regarding whether defendant was acting in response to strong provocation by his wife regarding his sexual inadequacy. The court did not allow this testimony, stating that the doctor's opinion would invade the province of the court to weigh all the evidence "in terms of provocation or otherwise" and to apply it to the factors in aggravation and mitigation. We do not believe this was an inappropriate ruling.

Defendant argues that the trial court erred in denying his motion to strike the entire presentence report. " '[T]he purpose of a presentence investigation report is to insure that the trial judge will have all necessary information concerning the defendant before sentence is imposed ***.' " *People v. Harris* (1985), 105 Ill. 2d 290, 299, quoting *People v. Youngbey* (1980), 82 Ill. 2d 556, 564.

Defendant maintains that the presentence report was highly prejudicial because the preparer of the report injected his personal beliefs into the report. In particular, defendant objects to the personal opinions contained in the "Analysis and Recommendations" section of the report. In discussing this section the court stated that the opinions expressed therein were the opinions of the probation officer who prepared the report and that the court would consider them, basically, as just that, *i.e.*, the opinions of one person.

As part of the presentence report, the court had before it a social history evaluation which presented somewhat of an opposite view of defendant as that of the probation officer. The court also had before it evaluations prepared by defendant's psychiatrist, Dr. Baron, the State's psychiatrist, Dr. Lahmeyer, and psychologist Dr. Garfield, to whom defendant had been referred by Dr. Baron for psychological testing; statements provided by the victim's mother and brother; and various other documents such as defendant's school records, military records, and medical records. The court listened to defendant's evidence in mitigation, the defendant's statement of allocution, and the arguments of both counsel. It is evident from the court's comments in

sentencing defendant that the court considered all of these factors and not just the personal opinions and recommendations of the probation officer who prepared the presentence investigation report. Moreover, those opinions represented the preparer's attempt to weigh the conflicting information he gathered during his investigation and to draw conclusions thereon.

As the State points out, defendant was not entitled to have the report stricken because he disagreed with its conclusions, nor because it portrayed defendant as a bad person. We conclude that the trial court did not err in denying defendant's motion to strike the presentence report.

In his last contention, defendant argues that he was denied due process by the State's systematic exclusion of males from the jury. This issue was not raised in defendant's original brief but, rather, surfaced when additional appellate counsel appeared. That counsel then moved to file a supplemental brief, adding the instant issue to the 13 other issues already raised by defendant.

■■ A review of the record, which was not before us at the time defendant requested leave to file his supplemental brief, reveals that the instant issue was raised in defendant's post-trial motion. As such, defendant's original counsel, who has not withdrawn and remains as defendant's appellate counsel despite the addition of secondary appellate counsel, was aware of and had the opportunity to raise this issue in defendant's original brief. Yet, counsel failed to do so. Not until seven months after filing that brief, when additional counsel materialized, did the issue arise.

Motions made in the reviewing court are open for reconsideration. (*People v. Nichols* (1986), 143 Ill. App. 3d 673, 676.) We have reconsidered our order allowing defendant to file his supplemental brief and find that the brief should be disallowed. To allow the filing of a supplementary brief in question is to encourage appellants in future cases to seek to raise additional issues which could have been raised in the first instance in an appellant's original brief but were not. This court does not permit an appellant to raise new issues in a reply brief. (134 Ill. 2d R. 341(g); *Terracina v. Castelli* (1979), 80 Ill. App. 3d 475, 479.) Therefore, we should not permit an appellant to file a supplemental brief which seeks to accomplish the same purpose, *i.e.*, to raise an issue not previously considered in his original brief.

Furthermore, defendant has waived the issue of the jury selection process by failing to raise the exclusion-of-males issue at the time the selection process was completed. A defendant may not acquiesce in improprieties occurring during jury selection and then later seek a re-

versal of his conviction on that basis. (*People v. Escobedo* (1986), 151 Ill. App. 3d 69, 87.) Thus, even if defendant had raised the jury selection process issue in his original brief, we would have determined that he had not properly preserved it for review.

For all of the reasons stated above, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and QUETSCH, JJ., concur.