NOTICE

Decision filed 12/05/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 200055-U

NO. 5-20-0055

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Perry County. |
| | ) | |
| v. | ) | No. 16-CF-73 |
| | ) | |
| ANDREW S. KIRKPATRICK, | ) | Honorable |
| | ) | James W. Campanella, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justice Barberis concurred in the judgment.
Justice Cates specially concurred.

**ORDER**

¶ 1   *Held*:   The State proved defendant guilty of predatory criminal sexual assault of a child and we decline to address the second issue on appeal for failure to comply with Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 2   Defendant, Andrew S. Kirkpatrick, appeals from his seven predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) convictions. On appeal, he challenges the conviction on count III, asserting the State failed to prove the charge beyond a reasonable doubt. Defendant also filed a supplemental brief, asserting the jury instructions and closing arguments constituted plain error. For the reasons below, we affirm.

1

¶ 3                    I. BACKGROUND

¶ 4     After defendant's wife, Heather Kirkpatrick, discovered her daughter, A.G., and defendant in their backyard pool with both of their swimsuit bottoms off on June 5, 2016, defendant was charged with two counts of predatory criminal sexual assault of a child (*id.*). Count I alleged defendant placed his penis in or onto the vagina of Jane Doe, who was under the age of 13. Count II alleged defendant placed his hand or finger in or onto the vagina of Jane Doe, who was under the age of 13.

¶ 5     On September 26, 2018, the State filed an amended information charging seven counts of predatory criminal sexual assault of a child (*id.*). The first three counts concerned defendant's actions with A.G.—a child under the age of 13—on June 5, 2016, and alleged that defendant knowingly touched A.G.'s vagina with his penis (count I), touched her vagina with his finger (count II), and touched her anus with his finger (count III), for the purpose of sexual gratification. The next two counts alleged that between January 1, 2016, and June 4, 2016, defendant knowingly touched A.G.'s vagina with his finger (count IV) and placed his penis in A.G.'s hand (count V), for the purpose of sexual gratification. Count VI alleged, between January 1, 2016, and June 4, 2016, defendant touched A.G.'s vagina with a sex toy. Count VII alleged, between January 1, 2016, and June 4, 2016, defendant penetrated A.G.'s mouth with his penis.

¶ 6     Defendant's trial began on November 18, 2019. The State first called Heather to testify. Heather stated that A.G. was her daughter and defendant was her ex-husband. Defendant and she also had a son together. Defendant and she got married in 2014.

¶ 7     Heather testified that on June 5, 2016, she, A.G., defendant, and their son lived in Du Quoin, Illinois. At that point, they had lived there for about a year and a half. On June 5, 2016, Heather had family over for a barbecue. People were grilling outside, and the children were

2

swimming in a blow-up pool. The pool was 5 feet wide by 10 feet long and roughly a foot and a half deep. A.G. was seven years old at that time.

¶ 8 Around 4:30 p.m., Heather's family left the barbeque, and only defendant and her children remained. About 10 minutes after her family left, Heather went inside the house to the living room. Sometime after, defendant brought their son in and stated that the son was getting tired. Defendant handed their son to Heather and stated he was going to go back outside to play with A.G. because they were having fun. Around 5:30 p.m., her son ran through the house, went into the kitchen, climbed up on the table, and hit on the back window yelling for defendant. When Heather went to check on her son, she looked out the window to see what he was looking at and saw defendant in the pool.

¶ 9 Heather testified that she had a clear view of the pool from the window, explaining that because the house was at a higher elevation than the pool, she could see into the pool. She stated that defendant was sitting in the pool and A.G. was "kind of catty-cornered over the top of him, like her hands were between his legs. Kind of catty-cornered and she was on all fours, and she had no swimsuit bottoms on." Heather confirmed that A.G. had been wearing swimsuit bottoms before. Heather testified that A.G.'s bare butt was facing her, and defendant had his right hand between her legs and his right thumb was pushed against her left butt cheek. She could not see exactly what defendant was touching but knew "it was really close."

¶ 10 At that time, Heather knew she needed to get A.G. out of the pool, so she ran out of the back door and yelled for A.G. to come to her. A.G. ran to Heather, crying and saying that defendant took her swimsuit bottoms off and would not give them back to her. Heather stated that when A.G. exited the pool she turned and grabbed her swimsuit bottoms from the right side of defendant. Heather then screamed at defendant to stand up to see if he had an erection. After the fourth or

3

fifth time of her demanding he stand, defendant refused to stand up and said that his swimsuit bottoms fell off. Heather stated that defendant had his swimsuit bottoms on all day, and they never fell down. Heather then grabbed her children to leave. Defendant ran up to her on the front porch as she was leaving and said, "it's not what it looks like." Heather then left to go to her brother's home.

¶ 11     On the way to her brother's home, Heather asked A.G. if defendant had done this before and A.G. said he had multiple times. Heather's mother was at her brother's home and advised Heather that they should take A.G. to the hospital. Heather and her mother took A.G. to Marshall Browning Hospital, and Heather's son stayed with her brother. Heather stated that A.G. was still wearing her wet swimsuit. Heather testified that she had not yet called the police because she was concerned about A.G. and wanted to first make sure she was okay. The hospital called the police to inform them of the incident. The hospital also informed Heather that A.G. would need to be transferred to St. Louis for a proper examination. A.G. was transferred to Cardinal Glennon Hospital in St. Louis, Missouri.

¶ 12     After a day or two, Heather took A.G. to be interviewed at the Child Advocacy Center (CAC). Heather confirmed that she was not in the interview, never saw the interview, and did not know what was said at the interview. Within a day or two of the pool incident, Heather moved out of the home she shared with defendant and did not have any further contact with him. On June 23, 2016, Heather took A.G. to a follow-up at Cardinal Glennon and Dr. Shaw examined A.G.

¶ 13     Heather testified that police asked her if she and defendant had sex toys, specifically a purple sex toy. Heather said she did have a purple sex toy that she and defendant used before, and it was located in the top dresser drawer in her room. Heather stated that, to her knowledge, A.G. would not have any knowledge about this sex toy.

4

¶ 14   Heather stated that A.G. never had trouble wiping herself after she used the restroom and defendant never told Heather that A.G. needed help wiping. Heather further stated that A.G. had some urinary tract infections but those were not due to improper wiping. Around the time of the pool incident, Heather worked 60-70 hours a week, Monday through Saturday, from 3 p.m. to 11 p.m. Defendant watched the children while Heather worked, and to her knowledge, no one else was at their home.

¶ 15   On cross-examination, Heather testified that her son would have been two years old at the time of the incident. Defense counsel asked how Heather knew A.G. did not go into her room and look in the drawer that contained the sex toys. Heather replied, "Because she wasn't allowed in our room." Heather agreed that A.G. did not always do what she was supposed to do and could have gone into their room when Heather was at work.

¶ 16   Dr. Shaw testified that she evaluated A.G. on June 23, 2016, during a follow-up visit from an emergency room visit on June 6, 2016. At the evaluation, A.G. stated that she was worried she might be pregnant. A.G. stated that defendant touched her mouth, chest, "front private, and her back crack" with his private area. A.G. did not remember ever bleeding but remembered feeling sore and red and that it sometimes hurt to pee. Dr. Shaw examined the child's body with a focus on the child's genital and anal area. She conducted an external examination, using her hands to see into the genital and anal area using a magnifying lens.

¶ 17   Dr. Shaw stated that she did not observe any suggestion that there was a visible infection and no visual indication of any current or healed injury. Dr. Shaw testified that finding no visible injury was consistent with A.G.'s description of what happened. She explained that national research studies showed that most children who had someone place their finger or penis into their

5

mouth, hands, chest, front private, or back private did not have an infection, were not pregnant, and did not have any visible signs of injury.

¶ 18 On cross-examination, Dr. Shaw stated that external signs of penetration in a child's vagina depended on the child's age and weight, the sexual maturity of the child, and if there was true penetration. She explained "there is a difference between penetration of the vaginal area, the vaginal vestibule and into the vagina where a tampon goes or where a baby is delivered from." Dr. Shaw testified that there would typically be no sign that a penis penetrated the labia, and the hymen would remain intact. She further stated that it would be very difficult for an adult male to completely insert his penis into the vagina of a child of A.G.'s age, but if that occurred, the hymen could be injured. Upon defense counsel's questioning, Dr. Shaw confirmed that her examination of A.G. did not reveal an indication that she had been sexually abused. On redirect, Dr. Shaw stated that the fact that A.G.'s examination was normal did not mean that she was not sexually abused.

¶ 19 A.G. testified that she was 11 years old and her birthday was November 14, 2008. A.G. testified that she lived on South Madison Street, Du Quoin, Illinois, and had lived there for 2½ years, which was how long defendant and her mother had been married. On June 5, 2016, her grandmother, uncle, cousin, brother, defendant, mother, and she were barbecuing and swimming at her house. She clarified that her brother and she were swimming. She did not recall defendant swimming with them. A.G. could not remember whether they barbecued or swam during the day or night. At some point, her grandmother, cousin, and uncle left. Her mother went inside and her brother, defendant, and she stayed outside.

¶ 20 A.G. stated that defendant took her brother inside, laid him down, came back outside, and texted her mother that her brother was ready for bed. Defendant then got into the pool with A.G. She could not remember what he was wearing. At first, they played with squirt guns, and

6

everything seemed normal. A.G. testified that things changed, and defendant pulled her swimsuit bottoms off and pulled his swimming trunks down to his kneecaps. Defendant put her swimsuit bottoms behind him and A.G. tried to get them but could not. She did not remember whether she or he said anything. Then, she was on his lap with her back up against him. A.G. stated that his private part was touching her private part. A.G. also testified that defendant's private part touched her butt. She did not remember how long it lasted. She stated she just sat there because she did not know what to do. The next thing A.G. remembered was her mother coming outside, yelling at her to get out of the pool. A.G. stated her mother was angry. A.G. then grabbed her swimsuit bottoms from behind defendant, put them on, and ran onto the porch. A.G.'s mother grabbed her brother and her and got in the car. They went to her uncle's trailer. When they arrived, her mother went inside the trailer, A.G. sat in the car for a few minutes and then went into the trailer. Her mother was still furious and crying. A.G. thought she was in trouble for not telling her mother what happened.

¶ 21    A.G. testified that eventually, her grandmother, mother, brother, and she went to Marshall Browning Hospital. At the hospital, she spoke with a few police officers, was checked out, and was sent to St. Louis Cardinal Glennon Hospital. A.G. could not remember exactly how she was checked out at Marshall Browning Hospital. At Cardinal Glennon Hospital, A.G. was again examined. She explained that the doctors looked at her private parts and she spoke with the doctors. A.G. stated that she was able to go to her grandmother's house that night.

¶ 22    A.G. stated that she remembered talking with a lady at the CAC a couple of days later and discussed what happened in the pool. A.G. testified that the lady asked her if she remembered anything like that happening before and A.G. answered affirmatively. A.G. stated that sometime before the pool day, she was lying on her mother and defendant's bed with her head up by the

7

covers and her feet hanging off the bed. She had clothes on, but defendant took them off. Defendant also had clothes on but took off his shorts. A.G. stated that defendant did not have underwear on, but she could not remember whether he had no underwear on to begin with or took them off as well. Defendant was standing over A.G., and she could see his private part. Defendant grabbed her legs and pulled her towards him. His private part was touching her private part, skin to skin. She did not know what he was doing, and he did not say anything during this time. A.G. testified that he hurt her, saying, "He put it in so far that it hurt." She further stated that it felt like a lot went in. Some days she could not go to the bathroom because it burned. At this time, her mom was working and only her brother was home. A.G. averred that it happened more than one time but did not know how many times.

¶ 23    A.G. also testified that defendant had his private part touch her mouth, but she could not remember when it happened. This also occurred in the home. A.G. stated that defendant grabbed her hair softly and pushed his private in her mouth. A.G. testified that it made her choke, and only happened one time.

¶ 24    A.G. stated that she remembered telling the CAC person that while she was in her mother and defendant's bedroom, defendant took out a purple thing from a red toolbox. She said, when you pushed a button on the purple thing, it buzzed. Defendant pushed the button and put it on her private part. A.G. identified the purple sex toy in the State's exhibit No. 28, as the item that defendant used on her.

¶ 25    A.G. averred that defendant also put his hand on her private parts but could not remember when or what room this occurred. She also could not remember how he touched her. A.G. also testified that defendant made her hold his private part in her hand one time but did not remember when or where that occurred.

8

¶ 26    On cross-examination, counsel asked A.G. if she remembered telling the lady at the CAC that this happened a thousand times. A.G. stated yes and that she believed it did happen a thousand times. Counsel also asked if A.G. remembered telling officers at the hospital that defendant never put his private part in her hand. She stated that she did not tell the officers that. A.G. confirmed she told the lady at the CAC everything that she just testified about.

¶ 27    A.G. stated the pool incident occurred in the middle of her backyard in daylight. She testified that she did not say anything to her mother when her mother came out of the house yelling, when they drove to her uncle's house, or on the way to the hospital. A.G. testified that defendant's behavior began when they lived in Red Bud, when her brother was a baby, and her mother was not yet married to defendant. She did not tell anyone because she was scared she would get into trouble. Defendant also told her not to tell her mom about defendant's behavior once they moved to the South Madison Street house in Du Quoin. Upon further questioning, A.G. stated that defendant's behavior also began after her mother got married to defendant.

¶ 28    The State next called Betti Mucha, an executive director at Perry-Jackson CAC, to testify. Mucha testified that on June 10, 2016, she was the lead forensic interviewer at the facility and interviewed A.G. Mucha explained that the parent was taken to another room and was not allowed to be present in, watch, or review the interview. She testified that her entire conversation regarding any of A.G.'s allegations was contained in the DVD marked as the State's exhibit No. 34 and the exhibit fairly and accurately represented the conversation. The court admitted the exhibit without objection and published it to the jury.

¶ 29    In the recorded CAC interview, with respect to the pool incident, A.G. stated that defendant took her brother inside and told her mother that her brother was ready for bed. A.G. stated that she went inside and asked her dad if he was done because she wanted him to come play with her in the

9

pool. She said that, in the pool, she squirted defendant in the leg with a squirt gun. Defendant then pulled her and his swimsuit bottoms down. Her brother was banging on the "door" and her mom came out and asked, "why was the middle of his thinger in her butt cheek." When A.G. said, "middle of his thinger," she lifted her right hand with her fingers extended and parallel to the floor. Defendant said he was trying to find her underwear, but A.G. said that was not true. She stated she was trying to pull away, but defendant kept pulling her back.

¶ 30    After Mucha explained that A.G. was there so that she could tell Mucha what happened, A.G. began to provide specifics. A.G. said she was sitting in the pool trying to keep her legs crossed and tried to put her underwear on, but defendant pulled her back and took her underwear from her. He then put his "little thing" up her.

¶ 31    Mucha presented drawings depicting a naked male and female so A.G. could identify what she meant. When asked what "little thing" meant, A.G. pointed to the male's penis. Mucha circled where A.G. pointed and wrote something to the side of it. A.G. said defendant put it up her a little bit and it felt like ice. When asked where defendant put his little thing, A.G. pointed to the vagina on the drawing of the female and called it her private. At first A.G. said nothing else happened, then she said he put "his—this thing" between her butt cheeks. When A.G. said this, she pointed to the hand on the drawing of the male.[1] Mucha circled where A.G. pointed and asked if defendant put it anywhere else, A.G. said he put it "in my butt cheek" and her private and nowhere else.

¶ 32    A.G. then told Mucha that on a different day, defendant put his "little thing" in her mouth. She said that he liked to grab her head and push "it" in her mouth. A.G. stated it felt like a little Q-Tip was going in her mouth.

---

[1]Defendant alleges A.G. again pointed to the penis at this point, but we later explain why defendant is incorrect.

¶ 33 Mucha asked if defendant ever said anything during this, and A.G. stated no. Mucha stated that A.G. said defendant's hand touched her butt and when asked if his hand touched her private. A.G. said that defendant put his hand "in my butt crack" and started touching her private. A.G. demonstrated by moving her hand behind her body to her butt then pointed to her vagina. When asked if this happened another time, A.G. said it happened in the pool one time and in the living room and her mom's bedroom.

¶ 34 A.G. stated that that defendant's actions began when she was still seven. Mucha asked A.G. to describe one of the previous times defendant performed those actions. A.G. said when defendant got home, he laid her brother down early and "starting doing it." When her brother got up, defendant put his shorts on and told her brother to lay back down. Then, defendant came in the bedroom and put his "little thing" in her private part. He also put his pointy finger in her private part. A.G. said this happened a thousand times. She averred that defendant did this stuff while her mom was at work.

¶ 35 When asked if defendant used anything other than his little thing or hand, A.G. said he used a little toy that he used on her mom. When her mom was at work, he used it on her. He got it out of the drawer and put it on her private part. It was purple, buzzing, and had a button on the back. A.G. said when defendant was done with her, sometimes he would wipe his little thing off with a red rag or a red towel.

¶ 36 A.G. was scared to tell anyone because she did not want to say it in front of her dad. When defendant was not there, defendant's mom was there and she never believed A.G. When asked if defendant touched her breast or butt, A.G. said he put his fingers and little thing in her.

11

¶ 37    When Mucha pointed to the breast portion of the drawing of a female, A.G. called it a private and said defendant put his hands and thing on her. When Mucha pointed at the butt of the female on the drawing, A.G. called it a butt cheek.

¶ 38    After the video was played, Mucha identified the State's exhibit Nos. 35 and 36 as the drawings she used during A.G.'s interview. The court admitted the exhibits without objection.

¶ 39    On cross-examination, Mucha explained the interview was a neutral fact-finding mission and she was not an advocate for the State, but she could not remember any time that she testified for the defense. Mucha clarified that she had testified less than 10 times and never testified for the defense.

¶ 40    On redirect examination, Mucha testified that not every child she interviewed disclosed abuse and not every interview resulted in charges being filed. Under such circumstances, there would be no ability to testify for the defense.

¶ 41    Detective Phillips E. Schimanski testified that on June 5, 2016, he was called into work to investigate a criminal sexual assault of a child to which defendant was the suspect. Between 9 and 9:30 p.m., defendant was brought to the Du Quoin Police Department. Detective Schimanski and Sergeant Ingram interviewed defendant. The interview was recorded, and defendant was aware the interview was recorded.

¶ 42    Detective Schimanski testified that before questioning began, he read defendant his *Miranda* rights and provided the waiver of *Miranda* rights form. Defendant stated he understood, was willing to speak with the officers, and signed the waiver form. Detective Schimanski identified the State's exhibit No. 38 as the complete recording of the interview.

¶ 43    The State published exhibit No. 38 to the jury. The video showed that after Detective Schimanski read defendant his *Miranda* rights, defendant began speaking about the pool incident,

12

stating that A.G. and he were playing in the pool. According to defendant, A.G. kept pulling his pants down and he kept telling her to stop. He said A.G. also kept trying to grab his penis but he pushed her away. Defendant stated that A.G.'s swimsuit bottoms fell off when she scooted her butt on the floor of the pool. He said her swimsuit did not fit well and was too tight. He told A.G. to put her bottoms on twice but gave up because she would not listen to him. He estimated that her bottoms were off for about five minutes. Defendant stated he sat down to pull his pants up so A.G. would not see anything. He stated several times that nothing happened. When Heather came outside, A.G. was swimming toward defendant with her butt up and defendant was trying to put his swimsuit bottoms on. He stated his hands were not touching A.G. and he was covering up his own privates.

¶ 44     Detective Ingram asked how long A.G. tried to climb on him, and defendant replied ever since they moved back to town. Detective Ingram clarified that he meant how long did A.G. try to climb on defendant in the pool, defendant stated that A.G. mainly wanted to play with him, but it then got out of hand. He never told Heather because she does not believe anything he says.

¶ 45     Defendant denied touching A.G. inappropriately several times. He also stated that no one ever believed him and A.G. lies. After further discussion, defendant admitted he was not the only one who touched A.G. "down there." Defendant said Heather's younger brother also touched A.G. Defendant said he used his forearm and did not use his fingers.

¶ 46     The interview also revealed Detective Ingram said he believed something happened and that it weighed heavy on defendant's mind. Defendant said it was on his mind because he did not do it. Detective Schimanski reminded defendant that he just said that he did something, but they were trying to figure out exactly what happened. Defendant admitted he may have accidentally

13

touched her "down there," but it was not on purpose. He explained that A.G. does not like to wipe so he touched her down there only so he could teach her how to wipe.

¶ 47    When defendant again denied doing anything inappropriate with A.G., Detective Ingram stated A.G. had specific details of what happened and seven-year-olds could not fabricate that stuff. Defendant replied that the officers would be surprised. Detective Ingram replied that if defendant could make up such a story when he was seven years old, then something was done to him. Defendant then admitted being sexually abused when he was younger but stated he did not want to talk about it. He then said to cuff him and put him behind bars because chances were that if it happened to him, he probably did do it. Detective Ingram stated that he never said defendant probably did it. Defendant said, "No, I did."

¶ 48    Detective Schimanski said defendant was giving what they called a "weak confession." Defendant clarified that he was giving a confession and said that he did touch A.G. once or twice down there, but he did not mean it or feel good after. The officers told him they were trying to help him and needed to figure out what happened. Defendant said he did not touch A.G. with his penis but touched her with his hands. Detective Ingram asked if defendant touched her butt, vagina, or breasts. Defendant replied he touched A.G.'s butt every day because he spanked her. He further said he accidentally slipped and touched somewhere he did not want to touch. Detective Ingram asked if it was her vagina and then said defendant nodded yes. Defendant stated that it only happened that day. Detective Ingram asked about what happened on the couch. Defendant said they were playing a video game on the couch and A.G. kept trying to pull his penis out and he did not know why. He said that A.G. would grab ahold of his penis. When asked what A.G. would do, defendant held his hand as if it was holding something and motioned it up and down. He did not

14

know how she knew how to do that. Defendant told her no and to stop. Eventually, defendant said he touched her vagina a few times, once on the couch and once in his bedroom.

¶ 49    After the video ended, on cross-examination, Detective Schimanski testified that he did not accept defendant's denials based on the information provided by A.G. and her mother and that some of defendant's statements seemed to not be truthful. He further testified that prior to the interrogation, he went to Marshall Browing Hospital and interviewed A.G. and her mother. He remembered asking A.G. whether defendant ever made her touch his penis and A.G. said, "No." Detective Schimanski averred that he submitted the following to the crime lab for analysis: a purple-colored rubber battery operated vibrator; a swab of the end of the sex toy; a swab of the base of the sex toy; a Missouri State Police sexual assault evidence collection kit, including vaginal swabs, oral, and anal swabs from A.G.; DNA buccal swabs from Heather; and DNA buccal swabs from defendant.

¶ 50    The State rested. Defense counsel moved for a directed verdict on all seven counts, arguing that the witnesses' testimonies were not credible but were instead confusing, contradictory, and not supported by forensic or medical evidence. The court denied the motion.

¶ 51    The defense called defendant's mother, Joyce Kirkpatrick, to testify. Joyce stated she lived in Du Quoin all 64 years of her life. She adopted defendant when he was 27 months old. Joyce averred that defendant and Heather began dating in January of 2013 and married in February 2014. Joyce testified that she was familiar with defendant and Heather's relationship and had regular contact with them. Joyce stated that she observed deterioration in defendant and Heather's relationship in the spring of 2016.

¶ 52    The defense called the chief of the Du Quoin Police Department, Steve Ingram, to testify. Chief Ingram stated he was appointed to chief of police a month earlier but was a Du Quoin officer

15

12 years prior. He was involved in the investigation and responded to Marshall Browning Hospital with Detective Schimanski. While he was there, he spoke with Heather and A.G. After looking at the police report to refresh his memory, Chief Ingram testified that A.G. answered no when asked whether defendant made her touch his penis.

¶ 53    Chief Ingram stated that he was also present during defendant's interrogation. Chief Ingram remembered defendant made several denials of wrongdoing during the interrogation but could not attach a specific number or range.

¶ 54    On cross-examination, Chief Ingram testified that his interview of A.G. was just to get "the nuts and bolts" of what happened, knowing there would be a supplemental interview for additional details and more in-depth, difficult questions. The defense rested.

¶ 55    The jury found defendant guilty of all seven counts. On December 5, 2019, defendant filed a motion for a mistrial, based on an error in the verdict forms not relevant here. After a hearing on January 10, 2020, the court denied the motion for a mistrial.

¶ 56    On December 20, 2019, defendant filed a posttrial motion alleging the evidence was insufficient for all counts, the court erred in denying defendant's motion to suppress, and the court erred in admitting hearsay statements. After a hearing on the matter, the court denied the motion. On February 13, 2020, the court sentenced defendant to seven years' imprisonment on each of the seven counts, to run consecutively.

¶ 57                                II. ANALYSIS

¶ 58    On appeal, defendant argues that the State failed to prove beyond a reasonable doubt that defendant touched A.G.'s anus on June 5, 2016 (count III). In his supplemental brief, defendant cites *People v. Kidd*, 2022 IL 127904, to argue that plain error occurred where the jury instructions and closing arguments erased the distinction between the "contact" counts and the "penetration"

16

counts such that the jury was "not only permitted, but encouraged," to find guilt on the six contact counts without finding a "purpose of sexual gratification or arousal."

¶ 59                                    A. Sufficiency of the Evidence for Count III

¶ 60    Due process requires the State to prove each element of an offense beyond a reasonable doubt. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364 (1970). It is not our function on review to retry defendant or substitute our judgment for that of the trier of fact. *People v. McLaurin*, 2020 IL 124563, ¶ 22. Rather, we must determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 11. In doing so, we view the evidence and reasonable inferences thereof in the light most favorable to the State. *People v. Vanhoose*, 2020 IL App (5th) 170247, ¶ 24. We give great deference to the trier of fact's determinations regarding the weight of the evidence and witness credibility, unless the "evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 61    To prove predatory sexual assault of a child, the State must prove defendant "is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration, and *** the victim is under 13 years of age." 720 ILCS 5/11-1.40(a)(1) (West 2016). Count III of the information alleged that on June 5, 2016, defendant, a person over 17 years of age, committed this offense by touching the anus of

17

A.G., a child under 13 years of age, with his finger for the purpose of the sexual gratification or arousal of the defendant.

¶ 62    Defendant does not dispute that he was over the age of 17 and A.G. was under the age of 13. Instead, defendant argues there was no evidence that his finger contacted A.G.'s anus on June 5, 2016, for his sexual gratification. He notes A.G. never indicated that defendant touched her anus.

¶ 63    The State concedes that neither the State nor the defense asked A.G. at trial if defendant touched her anus with his finger on any date, but argues other evidence was admitted from which the jury could draw a reasonable inference that such contact occurred. We agree.

¶ 64    To sustain the predatory criminal sexual assault of a child charge in count III, the State had to "prove 'actual contact' between the defendant's sex organ and the *** anus of the complainant." *People v. Atherton*, 406 Ill. App. 3d 598, 609 (2010); see also *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 41. While A.G. did not explicitly state—at any time—that defendant's hand touched her anus, it was reasonable to infer such happened based her statements. See *People v. Bell*, 234 Ill. App. 3d 631, 636 (1992) (where reasonable, a jury is entitled to draw an inference of contact from the evidence).

¶ 65    In the CAC interview, A.G. stated her mom came out of the house and asked defendant why his "thinger" was in the middle of the center of her butt cheek. Defendant contends A.G. was referring to defendant's penis in this comment because he asserts A.G. said "thinger," and not "finger," and A.G. consistently used "thing" to refer to his penis. Defendant also argued that A.G. knew to use the word "hand" or "finger" when appropriate, as she referred to "hand" and "finger" at other times during the interview. We disagree. After reviewing the video, we find the jury could have reasonably concluded A.G. was referring to defendant's finger. She consistently used "little

18

thing," "thing," and "private" to refer to defendant's penis, and never used "thinger" to refer to his penis. Moreover, contrary to defendant's contention that A.G. motioned an erect penis while making this statement, A.G. held up her hand with her fingers extended and parallel to the floor. Showing her hand in such way does not demonstrate an erect penis. The jury therefore could have reasonably inferred A.G. simply mispronounced the word and was referring to defendant's finger (see *People v. Douglas*, 2014 IL App (5th) 120155, ¶ 30 ("It is within the province of the jury to assess the credibility of witnesses, weigh evidence presented, resolve conflicts in evidence, and draw reasonable inferences therefrom, and its determination is entitled great deference.")), and we view all reasonable inference from the evidence in the light most favorable to the State (*Vanhoose*, 2020 IL App (5th) 170247, ¶ 24). Notwithstanding, it is reasonable to infer defendant's hand was in between A.G.'s butt cheeks based on Heather's testimony that A.G.'s butt was facing her, and she only saw defendant's right thumb on A.G.'s butt cheek.

¶ 66　　A.G. also pointed to the hand on the male drawing when she said defendant put "this thing" between her butt cheeks. Defendant claims that A.G. pointed to defendant's penis, arguing A.G. often referred to defendant's penis as his "thing" and Mucha circled the penis on the male drawing at that time. We find such argument illogical. While the video does not provide the clearest point of view, A.G. pointed to the side of where the penis was located on the male drawing. Moreover, at this point in the CAC interview, Mucha had already circled the penis and labeled it. There would be no reason to circle the penis again and, in fact, there was no second circle around the penis of the male drawing used during the interview. There was however a circle around the hand of the male drawing. The video shows Mucha did not circle anything else on the male after this point, leading to the conclusion that A.G. pointed to the hand. Mucha also later stated that A.G. said defendant's hand touched her butt, and there was no other discussion of anything touching A.G.'s

19

butt except when she said his "thing" went between her butt cheeks. We acknowledge A.G. many times referred to defendant's penis as his "thing" or "little thing," but the fact that A.G. pointed to the hand while making the statement clearly shows A.G. meant defendant's hand was between her butt cheeks.

¶ 67     In the CAC interview, A.G. also stated that defendant put his hand in her butt cheek and started touching her private. A.G. demonstrated this by moving her hand behind her toward her butt. Further, when Mucha pointed to the butt on the female drawing, A.G. identified it was her butt cheek. Defendant argues that this statement did not regard the pool incident as A.G. had already begun discussing other instances of abuse at this time. We again disagree. The video shows that A.G. was referring to the pool incident. In fact, after A.G. began talking about a time that defendant put his penis in her mouth, Mucha redirected A.G. back to A.G.'s statement that defendant's hand touched her butt, which was said in relation to the events of the pool incident. It was at that point, A.G. again stated that defendant put his hand in her butt cheek and started touching her private. A.G. further stated that this happened in the pool, as well as in the living room and her mom's bedroom. A.G. thus referred to the pool incident and then explained the other times this activity occurred.

¶ 68     As such, A.G. stated twice that defendant's hand was in her butt or between her butt cheeks. Heather's observation of only defendant's thumb on A.G.'s butt cheek while her butt was facing Heather corroborates A.G.'s statements.

¶ 69     Defendant alternatively argues that even if A.G. stated defendant's hand was in her butt or between her butt cheeks, such statements are insufficient to the prove the charge. He compares this case to *People v. Oliver*, 38 Ill. App. 3d 166, 170 (1976), where the First District reduced a conviction to an attempt offense because even though the victim talked about defendant being "in

20

my butt" she characterized the same conduct as defendant's penis being along her "cheeks." He further contends that Illinois courts have underscored this specificity by holding that touching an area near the complainant's sex organ or anus is insufficient to establish the elements of penetration. *Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 41.

¶ 70 In *Oliver*, the court reversed the defendant's conviction for sexual deviate assault that allegedly occurred on November 1, 1973. " 'Deviate sexual conduct' is defined *** as any act of sexual gratification involving the sex organs of one person and the mouth or anus of another." (Internal quotation marks omitted.) *Oliver*, 38 Ill. App. 3d 166, 170 n.1 (1976). Penetration is not required, but to prove sexual deviate assault in that case, the State was required to prove "an act involving the sex organs of the defendant and the anus of the complaining witness." *Id.* at 170. The court found that the victim "did not precisely testify to the penis-anus touching but characterized defendant's conduct by a reference to 'in my butt.' " *Id.* It further stated that the victim made an out-of-court statement "in her husband's presence that the defendant's penis went along her 'cheeks.' " *Id.* Citing *Easy Life Club, Inc. v. License Appeal Comm'n*, 18 Ill. App. 3d 879 (1974), which held a penis against the buttocks was insufficient to support a charge of deviate sexual acts, the *Oliver* court found the defendant was not proved guilty of deviate sexual assault beyond a reasonable doubt. *Oliver*, 38 Ill. App. 3d at 170.

¶ 71 The victim here is not a married adult as in *Oliver*; rather, A.G. was a young child. As such, A.G. has less familiarity with properly labeling body parts and less knowledge of sexual terms. We would not expect her to testify to the acts with the same specificity as an adult. Importantly, unlike the victim in *Oliver*, A.G. did not dilute her "in my butt" testimony with a more specific contradictory out-of-court statement that defendant's fingers only went along her cheeks.

21

¶ 72    In penetration cases, it has been held that "[a] jury may reasonably infer that an act of penetration occurred based on testimony that the defendant 'rubbed,' 'felt' or 'handled' the victim's vagina." *People v. Hillier*, 392 Ill. App. 3d 66, 69 (2009) (citing *Bell*, 234 Ill. App. 3d at 636-37). "Such an inference is unreasonable only if the victim denies that penetration occurred." *Id.* (citing *Bell*, 234 Ill. App. 3d at 637). In those cases, penetration required " 'any intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person.' " *Id.* (quoting 720 ILCS 5/12-12(f) (West 2006)); see *Bell*, 234 Ill. App. 3d at 635. Just as the finding that penetration may be proven without specific testimony that the defendant was inside the victim's vagina, we find contact with a victim's anus may be established without direct statements that defendant touched the victim's anus unless the victim denies such contact occurred. Accordingly, viewing the evidence in the light most favorable to the State, we find the State presented sufficient evidence for the jury to conclude defendant touched A.G.'s anus and defendant was proven guilty of count III beyond a reasonable doubt.

¶ 73        B. Plain Error Based on Jury Instructions and Closing Arguments

¶ 74    Defendant next contends that the jury instructions and closing arguments misled the jury into believing it could find predatory criminal sexual assault of a child based on sexual contact without finding the purpose of sexual gratification (counts I through VI). Defendant acknowledges this issue was not raised below but requests plain error review. We decline to do so.

¶ 75    On appeal, "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Defendant raised this issue in a supplemental brief filed after the original round of briefing. Where our rules do not allow an appellant to assert new issues in a reply brief, the appellant should also not be allowed "to file a supplemental brief which seeks to accomplish the same purpose, *i.e.*, to raise an

22

issue not previously considered in his original brief." *People v. Pertz*, 242 Ill. App. 3d 864, 914 (1993); see also *People v. Harris*, 129 Ill. 2d 123, 171 (1989); *People v. Villareal*, 2021 IL App (1st) 181817, ¶¶ 25-26; *People v. Serritella*, 2022 IL App (1st) 200072, ¶¶ 111.

¶ 76    Defendant argues the untimely assertion of this issue is justified where the error found in the instructions and closing arguments is proved by *People v. Kidd*, 2022 IL 127904, which was published after his initial brief. We disagree.

¶ 77    In *Kidd*, the Illinois Supreme Court reversed defendant's two convictions for predatory criminal sexual assault of a child where the indictment failed to set forth all the elements of the charged offense. *Kidd*, 2022 IL 127904, ¶ 1. In doing so, *Kidd* explained that according to the predatory criminal sexual assault statute, if the indictment alleged contact, it must allege the contact was made for the purpose of sexual gratification or arousal of the victim or the accused. *Id.* ¶ 20. Conversely, if the indictment alleged penetration, it sufficiently pled the offense "without any allegation about the purpose of the penetration." *Id.* It found the prosecution did not charge a violation of the predatory criminal sexual assault statute where it alleged contact without adding the element of purpose. *Id.* ¶ 23. The court rejected the appellate court's conclusion that sexual contact was always made for the purpose of sexual gratification or arousal and thus the absence of language concerning sexual gratification did not affect the sufficiency of the indictment. *Id.* ¶ 29. It explained to hold otherwise violated the statutory construction principle that no part of a statute should be rendered meaningless or superfluous. *Id.* In support, *Kidd* cited *People v. Terrell*, 132 Ill. 2d 178, 209-11 (1989), and explained that "if the prosecution proves only sexual contact, it must also prove the defendant acted for the purpose of sexual gratification, because 'it is possible for the touching which is part of that offense to occur accidentally or unintentionally.' " *Kidd*, 2022 IL 127904, ¶ 29. The court also rejected the State's argument that the while the indictment referred

23

to "contact" it alleged facts amounting to penetration. *Id.* ¶¶ 24-25. It reasoned that the case was not one "of a mere omission of an element from the charging instrument," but the trial court and State consistently treated the case as predatory criminal sexual assault based on contact and wavered on whether purpose of contact was necessary. *Id.* ¶ 25.

¶ 78    *Kidd* does not address the interchangeability of a finding of contact with the required purpose and penetration. *Kidd* also speaks to nothing concerning sufficiency of jury instructions. Rather, it concerned a pretrial challenge to the sufficiency of an indictment—which defendant concedes is not at issue here.[2] At oral arguments, defendant conceded the issue in *Kidd* was different than the present issue. He further conceded that the instructions here properly recited the law as provided in the predatory criminal sexual assault of a child statute, but argued the instructions as a whole allowed the jury to convict defendant of the six predatory criminal sexual assault of a child charges based on contact without the necessary purpose.

¶ 79    While *Kidd* stated that the State must prove both contact and purpose of sexual gratification or arousal to convict a predatory criminal sexual assault charge based on contact—which are the statements defendant relies upon for the issue asserted in his supplemental brief—the *Kidd* court did not create or change the law. Rather, *Kidd* relied on a case published well before this appeal— *Terrell*, 132 Ill. 2d at 203-05—that held a person can be convicted in one of two ways: (1) sexual contact with the purpose of sexual gratification or arousal or (2) sexual penetration. *Kidd*, 2022 IL

---

[2]Defendant challenged the validity of information for count VI, arguing that it alleged contact between a sex toy and A.G.'s vagina and the statute only prohibits penetration of a sex toy. The State conceded count VI in the information was defective. However, both parties agree that the defect does not warrant reversal because the allegations were specific enough to allow defendant to prepare a defense and to bar future prosecution or the same conduct. See *People v. Libricz*, 2022 IL 127757, ¶ 37 (If a charging instrument is challenged for the first time on appeal, reversal is not required if "the indictment apprised the accused of the precise offense charged with enough specificity to (1) allow preparation of his defense and (2) allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct." (Internal quotation marks omitted.)).

127904, ¶ 21. While the *Terrell* case concerned the two predecessor statutes of aggravated criminal sexual assault (penetration) and aggravated sexual abuse (sexual conduct)—the principle that "a purpose of sexual gratification or arousal" constitutes an element when provided in a sexual offense statute has long been established. See *id.*; *People v. Kolton*, 219 Ill. 2d 353, 369 (2006); *People v. Kitch*, 2019 IL App (3d) 170522, ¶ 44; *People v. Alexander*, 369 Ill. App. 3d 955, 957 (2007). Despite *Kidd* stating that the purpose of sexual gratification or arousal was an element of the offense at issue here, the principles relied upon in *Kidd* were established before defendant filed his appeal. Defendant should not be allowed to circumvent our rules by relying on long established legal principles that are simply restated in a recently published case. As such, the publishing of *Kidd* does not excuse his failure to raise this issue in his initial brief.

¶ 80    "Motions made in the reviewing court are open for reconsideration." *Pertz*, 242 Ill. App. 3d at 914; *Dunn v. Patton*, 307 Ill. App. 3d 375, 376 (1999). We reconsidered our granting of defendant's request to file a supplemental brief and find it should not be allowed. To allow otherwise, would "encourage appellants in future cases to seek to raise additional issues which could have been raised in the first instance in an appellant's original brief but were not." *Pertz*, 242 Ill. App. 3d at 914.

¶ 81                                III. CONCLUSION

¶ 82    The State presented sufficient evidence to prove defendant made contact with the victim's anus, and we decline to address the issue raised for the first time in defendant's supplemental brief as untimely. Accordingly, we affirm.

¶ 83    Affirmed.

¶ 84    JUSTICE CATES, specially concurring:

25

¶ 85    I agree there was sufficient evidence to prove the allegations in count III of the amended information[3] beyond a reasonable doubt and concur in the result. I write separately because I do not agree with the majority's reasons for reversing our order that allowed supplemental briefing in this case. By way of background, this case was initially set for oral argument on December 8, 2022. Pursuant to the defendant's motion, we continued oral argument and ordered the parties to file supplemental briefs to address the impact, if any, of *People v. Kidd*, 2022 IL 127904 (Nov. 28, 2022), on the defendant's case. In supplemental briefing, the defendant argued, based upon *Kidd*, that the jury was improperly instructed that it could find him guilty of predatory criminal sexual assault of a child based upon "sexual contact," without finding an essential element of that charge, *i.e.*, that he acted with the purpose of sexual gratification or arousal. In his motion to continue and his supplemental briefing, the defendant readily acknowledged that he did not raise this issue in the trial court or in his original brief or reply brief in this court. He argued that the improper jury instructions resulted in a denial of due process, and he requested plain error review.

¶ 86    In its analysis, the majority correctly noted that motions made in the reviewing court are "open for reconsideration." The majority then reconsidered the defendant's motion and concluded that supplemental briefing in this case "should not be allowed," and that to "allow otherwise" would encourage appellants in future cases to request supplemental briefing to raise issues that could have been raised in the original briefs. *Supra* ¶ 80. I have a different perspective.

¶ 87    It is important to note that a reviewing court does not lack the authority to address unbriefed issues, and it may do so in an appropriate case, such as when a clear and obvious error exists in the trial court proceedings. See *People v. Hobson*, 2014 IL App (1st) 110585, ¶ 21; *Villareal*, 2021

---

[3]Count III of the amended information alleged that "on or about June 5, 2016, the defendant, a person over 17 years of age, committed an act of contact, however slight, in that he knowingly touched the anus of A.G., a child under 13 years of age, with his finger, for the purpose of the sexual gratification or arousal of the defendant, in violation of 720 ILCS 5/11-1.40(a)(1)."

IL App (1st) 181817, ¶ 27. As a reviewing court, we have the discretionary authority to address errors that were not raised in the trial court or in an appellant's original briefing if the errors are obvious and seriously affect the accused's right to a fair trial, or if the errors seriously affect the fairness or integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007); *People v. Herron*, 215 Ill. 2d 167, 186-88 (2005). In appropriate cases, supplemental briefing is consistent with and vital to the interests of justice. Here, the issue raised in supplemental briefing is one involving due process—whether the jury was properly instructed on the essential elements of predatory criminal sexual assault of a child offense involving "sexual contact." As the issue was fully briefed, we have the benefit of the parties' advocacy. Therefore, had we addressed the issue, we would have remained within our role as neutral arbiter while fulfilling our responsibilities for a just result and maintenance of a sound and uniform body of precedent. In addition, I have full confidence in the ability of the appellate court to discern whether supplement briefing will serve the ends of justice, and I do not share the majority's concern that this case will encourage future litigants to request supplemental briefing to raise issues that could have been raised in their original briefs but were not. Finally, although I disagree with the determination that supplemental briefing should not have been granted, I take no position on the merits of the issue presented in that briefing.

¶ 88    For the reasons stated, I respectfully concur in the result.